The Honorable Ronald B. Leighton

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON AT TACOMA

THE GEO GROUP, INC.,

Plaintiff,

v.

CITY OF TACOMA, a Washington
municipal corporation,

Defendant.

No. 3:18-cv-05233-RBL

**DEFENDANT CITY OF TACOMA'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

NOTE ON MOTION CALENDAR:
**Friday, September 6, 2019**

## I.     INTRODUCTION

Defendant City of Tacoma ("City" or "Tacoma") respectfully requests the Court dismiss this lawsuit for lack of ripeness.[1]  Alternatively, if the Court determines ripeness exists, the Court should (1) deny Plaintiff's Motion for Partial Summary Judgment in its entirety, and (2) grant the City's Cross-Motion Motion for Partial Summary Judgment on the Supremacy Clause, Preemption, declaratory judgment, injunction and 42 U.S.C. § 1988 issues Plaintiff's Motion raises.

Plaintiff's lawsuit challenges on various grounds Ordinance 28491 ("Ordinance"), which rezoned Plaintiff's privately-owned and operated federal immigration detention center, the Northwest Detention Center ("NWDC"), and which requires a Conditional Use Permit "(CUP") in order to expand or enlarge the facility.  Yet, Plaintiff GEO Group, Inc. ("GEO")

---

[1] Before the Court are Cross-Motions for Summary Judgment. This Court granted the City's request for overlength briefing. Dkt. No. 62.

DEF'S CROSS-MOT. FOR M.S.J. - 1
3:18-cv-05233-RBL

1035-00009/450908.docx

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

has not applied for a CUP to make any changes to the NWDC, nor has it applied for any permits at all, and nothing in the Ordinance has yet been triggered or applied to the NWDC. Without a CUP or other permit application for the City to consider, there is no impact or harm to GEO, much less unconstitutional interference with the federal government. Without any City decision on any application for expansion or enlargement of the NWDC, Plaintiff's challenges to the Ordinance are premature; they are not ripe for adjudication via a federal declaratory judgment action. Without a ripened controversy, GEO lacks standing, and its claims should be dismissed *in toto*.

Alternatively, and only if the Court finds Plaintiff's claims are ripe, GEO's Motion should be denied and the City's Cross-Motion relating to the matters raised in Plaintiff's Motion should be granted. The City's ability to regulate and zone Plaintiff's property is not preempted by the Supremacy Clause, and no applicable legal authority supports GEO's claims. Peeling back the rhetoric and examining the actual Ordinance, immigration statutes, and complete dearth of caselaw on the issue, Plaintiff has presented no basis upon which the Court could find a violation of intergovernmental immunity, nor is there any evidence of congressional intent sufficient to overcome the presumption <u>against</u> preemption.

## II.   STATEMENT OF FACTS

### A.   The GEO Group, Inc. and the NWDC

GEO operates the NWDC pursuant to a contract with U.S. Immigration & Customs Enforcement ("ICE") (referred to as the "ICE Contract")." *Declaration of Michael C. Walter* ("*Walter Decl.*"), Ex. F. The ICE Contract sets forth the terms under which the for-profit GEO operates the NWDC. *Id.* The objective of this contract is to obtain and operate a facility for the detention, transportation and feeding of detainees in support of the ICE ERO-Seattle Field Office. *Id.* at p. 000265. The NWDC is located within the City's Port Maritime Industrial ("PMI") zoning district. *Id.,* Ex. I, p. 000496.

KEATING, BUCKLIN & MCCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

**B.**   **Industrial zoning classifications in the City of Tacoma**

The three industrial zoning districts at issue in the Ordinance were originally established in 2003, pursuant to Ordinance 27079:

> 1. M-1 Light Industrial District. This district is intended as a buffer between heavy industrial uses and less intensive commercial and/or residential uses. M-1 districts may be established in new areas of the City. However, this classification is only appropriate inside comprehensive plan areas designated for low, medium, and high intensity uses.
>
> 2. M-2 Heavy Industrial District. This district is intended to allow most industrial uses. The impacts of these industrial uses include extended operating hours, heavy truck traffic, and higher levels of noise and odors. This classification is only appropriate inside comprehensive plan areas designated for medium and high intensity uses.
>
> 3. PMI Port Maritime & Industrial District. This district is intended to allow all industrial uses and uses that are not permitted in other districts, barring uses that are prohibited by City Charter. The Port of Tacoma facilities, facilities that support the Port's operations, and other public and private maritime and industrial activities make up a majority of the uses in this district.

*Id.*, Ex. D, p. 000062-63. The NWDC's PMI area is characterized by uses that are <u>not</u> consistent with human habitation, as it is a heavily congested area, and busy 24 hours a day with shipping, manufacturing and processing.

> This area is characterized by proximity to deepwater berthing; sufficient backupland between the berths and public right-of-ways; 24-hour operations to accommodate regional and international shipping and distribution schedules; raw materials processing and manufacturing; uses which rely on the deep water berthing to transport raw materials for processing or manufacture, or transport of finished products; and freight mobility infrastructure, with the entire area served by road and rail corridors designed for large, heavy truck and rail loads.
>
> ***The PMI District is further characterized by heavy truck traffic and higher levels of noise and odors than found in other districts.*** The uses are primarily marine and industrial related, and include shipping terminals, which may often include container marshalling and intermodal yards, chemical manufacturing and distribution, forest product operations (including shipping and wood and paper products manufacturing), warehousing and/or storage of cargo, and boat and/or ship building/repair. Retail and support uses primarily serve the area's employees.

KEATING, BUCKLIN & MCCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

> Expansion beyond current PMI District boundaries should be considered carefully, as such expansion may decrease the distance between incompatible uses. Expansion should only be considered contiguous to the existing PMI District. This classification is only appropriate inside comprehensive plan areas designated for high intensity uses.

*Id.* (emphasis added). These uses have only intensified since 2003.

The PMI District focuses on shoreline-related uses and support services, and it is "also subject to numerous unique environmental constraints, some related to its past and ongoing industrial activities, such as noise, safety, and contamination issues, and some related to its physical location within a floodplain and potential liquefaction and volcanic hazard zones." *Id.,* Ex. E, p. 000083-84.  Evidence showed, and the City Council concluded, that housing inappropriately competes with industrial uses and many industrial uses create unavoidable impacts on human health and well-being. If a residential-like use is to be allowed in an industrial zone, the City Planning Commission concluded it should be allowed only in the M-1 (Light Industrial) zone. *Id.,* at Ex. H.

## C.     The enactment of Ordinance 28491[2]

The Ordinance was adopted in response to concern for the dwindling space in the City's PMI zone, and also with the purpose of modifying the definition of correctional facility and creating a clear definition and use category for such facilities. Under the Ordinance, a Conditional Use Permit ("CUP") would now be required for new correctional and detention facilities in their permitted zones (*i.e.*, the M-1 zone), or for expansion of existing correctional and detention facilities.[3]

> WHEREAS the proposed correctional and detention facilities permanent regulations recommended by the Planning Commission would amend Sections 13.05.020, 13.06.100, 13.06.200, 13 .06.300, 13.06.400, 13.06.640,13.06. 700, and 13.06A.050 of the TMC, and would (1) modify

---

[2] For the Court's convenience, a complete copy of Ordinance 28491 is attached as **Appendix A** to this Opposition (as well as attached as Exhibit A to the *Declaration of Michael C. Walter*).

[3] Contrary to Plaintiff's allegations of disparate treatment and its Equal Protection claim, correctional facilities and detention facilities were intended to be – and in fact are – treated the same under the Ordinance. *See, Declaration of Steve Victor.* There was a scrivener's error in the final version of the Ordinance, which is being corrected legislatively.  A more detailed discussion of this minor error is discussed in the Declaration of Steve Victor.

**KEATING, BUCKLIN & McCORMACK, INC., P.S.**
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

the current definition of "correctional facility" and create a new and clearly distinct definition and use category for "detention facility"; (2) prohibit correctional and detention facilities in PMI (Port Maritime Industrial), M-2 (Heavy Industrial), and R-4L (Low Density Multi-family) zones; (3) allow correctional and detention facilities in the M-1 (Light Industrial), R-4 (Multi-family), and R-5 (Multi-family) zones; (4) require a Conditional Use Permit for new correctional and detention facilities (in zones where they are allowed) or significant modifications to existing ones; and (5) as part of the Conditional Use Permit process, require expanded public notice (to properties within 1,000 feet) and a pre-application community meeting,

*Id.* at Ex. A.  Importantly, under the express terms of the Ordinance, <u>the NWDC is allowed to remain at its location and continue to operate as a legal nonconforming use</u>. The City's land use expert, attorney and author Richard Settle, agrees:

"The NWDC is an existing nonconforming use and [is] entitled to remain in existence under TMC 13.06.630C.1 and changed under TMC 13.06.630C and expanded under TMC 13.06.630C and 13.06.640P… [T]the effect of the challenged Ordinance [28491] may be amended through a rezone (map amendment) to change the zoning of the NWDC site to M-1, or, through a zoning text amendment, to allow the correction and detention facility in the PMI zone."

*Declaration of Richard Settle,* Attachment[4] at ¶ 1.11.

As the City's expert also notes, "[t]he Ordinance does not in any way limit, prevent, or prohibit the existing operations of NWDC…[and] does not prohibit change or expansion of existing correction and detention centers, including NWDC." *Settle Report*, ¶ 1.4. The City Code provisions "allow changes in nonconforming structures and uses subject to typical, reasonable limitations, and allow expansion that would not increase traffic and parking by more than 10% as a matter of right, subject to reasonable performance standards, and expansion to an unlimited extent through a conditional use permit process." *Id*.

Pursuant to the Ordinance, the definition of "Correctional facility" was amended to: "A facility in which persons are held and housed primarily for the purposes of punishment, correction, or rehabilitation following conviction of a criminal offense." This definition includes prerelease facilities but does not include work release centers or juvenile community facilities. *TMC 13.06.700.C. Walter Dec.*, Ex. G, p. 000388.  A "Detention facility" is defined

---

[4] *Defendant's FRCP 26(a)(2) Disclosure of Expert Testimony of Richard L. Settle* (hereinafter "*Settle Report*").

DEF'S CROSS-MOT. FOR M.S.J. - 5
3:18-cv-05233-RBL

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

as "A facility in which persons are held and housed in custody under process of law, pending the outcome of legal proceedings, but not for the purposes of punishment, correction, or rehabilitation following conviction of a criminal offense." TMC 13.06.700.D. *Id.,* Correctional and detention facilities are treated similarly in terms of the zoning district in which they are permitted.[5] TMC 13.06A.050. *Id.* and *Declaration of Steve Victor*, ¶ 5.

The Ordinance expresses the legislative considerations and intent of the Tacoma City Council in its enactment. The Ordinance's recitals, which are expressly incorporated as the City Council's legislative findings, provide in pertinent part:

> WHEREAS some of the significant issues, concerns, and challenges the Planning Commission and City Council have faced during deliberation of the interim and permanent regulations concerning correctional and detention facilities include:  (1) the legality and appropriateness of the City's use of its land use regulatory authority to potentially address this broad-reaching, politically charged, and largely national-level issue; (2) the impact of the state's Growth Management Act and provisions relative to Essential Public Facilities; (3) broader land use concerns about allowing non-typical "residential" uses in the areas zoned for "traditional" multi-family dwellings; (4) broader land use concerns, and the inconsistency with the Comprehensive Plan policies, about allowing non-typical "residential" uses in the Tideflats industrial area that is considered not appropriate for temporary or permanent housing; and (5) the quality of life, health, safety, environmental, equity, and liability concerns of people living in areas not appropriate for human living; and

> WHEREAS, based on the public hearing and Council deliberation the Council developed additional amendments to Sections 13.06.100 and 13.06.400 which would (1) change the Commissions' recommendation and prohibit correctional and detention facilities in the R-4 (Multi-family), and R-5 (Multi-family) zones; (2) limit the availability of expansion for correctional and detention facilities by conditional use in the M-1 zone, to M-1 zones that in place as of January 1, 2018; (3) expand the notification requirements for correctional and detention facility expansion by CUP in the M-1 zones to 2500 feet; and

> WHEREAS, in formulation the additional amendments, the Council considered the testimony of residents and the weight of existing City, regional and State policies regarding the protection of scarce and dwindling

---

[5] The Ordinance contains no mention of NWDC whatsoever.  The language of the Ordinance is appropriately general in nature and not specifically limited to NWDC or institutions with the specific characteristics of NWDC, and it applies to all defined correction and detention centers in the City of Tacoma. *Settle Report*, ¶ 1.3.

DEF'S CROSS-MOT. FOR M.S.J. - 6
3:18-cv-05233-RBL

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE:  (206) 623-8861
FAX:  (206) 223-9423

port maritime industrial land from non-industrial uses, and

WHEREAS the City Council finds it in the best interest of public health, safety and welfare to enact the proposed correctional and detention facilities permanent regulations, as recommended by the Planning Commission, and amended by the Council.

*Walter Dec.*, Ex. A, p. 000021-24. This legislative purpose, together with the record, makes clear that the primary intent of the Ordinance was to prevent the new siting or expansion of housing facilities in the PMI District, an area determined to be unsafe and unsuitable for human habitation.  Another important purpose of the Ordinance is to preserve scarce PMI land from the new siting or expansion of non-PMI uses. These reasons are "well within reasonable public interest bases for adopting the Ordinance and, thus, there were rational public interest bases for adopting the ordinance, as required by state and local constitutional due process and equal protection provisions." *Settle Report*, ¶ 1.10.

The first purpose is clearly taken within the City's broad authority as a First-Class Charter City to provide for public health safety and welfare.[6]  The second purpose is clearly in furtherance of the City's GMA responsibilities regarding the port element of its comprehensive plan pursuant to RCW 36.70A.085.

This intent to de-emphasize human habitation in industrial zones is also reflected in the Tacoma Planning Commission's discussion prior to approving a recommendation to the City Council to adopt the Ordinance. *Walter Decl.*, Ex. G. "Vice-Chair Petersen further expressed concerns that locating correctional facilities and work release centers in the Tideflats area is not consistent with the Container Port Element ("CPE") of the Comprehensive Plan; that such uses are entirely incompatible with the industrial related uses for the 'Core Area' as defined in the CPE; that the Port of Tacoma and many citizens have argued that such uses are not industrial or maritime related uses; and that people should not

---

[6] "Any county, city, town or township may make and enforce within its limits all such local police, sanitary and other regulations as are not in conflict with general laws. *Washington State Constitution, Article XI, section 11*. "to the effect that '[a]ny fair or reasonable doubt concerning the existence of power is resolved by the courts against the corporation, and the power is denied,' should not be followed in determining a question involving the powers of a city of the first class..." *State ex Rel. Ennis v. Superior Court for Spokane County*, 153 Wash. 139, 279 Pac. 601 (1929).

DEF'S CROSS-MOT. FOR M.S.J. - 7
3:18-cv-05233-RBL

1035-00009/450908.docx

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

be housed in these areas, because of health, safety, environmental and equity concerns." *Id.,* p. 000466.

Ordinance 28491 implements the intent of the City Council by permitting detention facilities like the NWDC in M-1 (Manufacturing) Districts that were in existence as of January 1, 2018, by a Conditional Use Permit. Under Ordinance 28491, the NWDC becomes <u>a legal non-conforming use that may continue indefinitely at its present location within the PMI</u>, under the City's non-conforming use regulations. GEO <u>speculates</u> as to what <u>might</u> occur if Plaintiff in the future submits a land use permit application, but to-date Plaintiff has submitted no land use applications regarding the NWDC.

**D.      GEO can apply for a CUP if it needs to expand**

If GEO decides it wants to expand the NWDC, it can simply apply for a CUP. Tacoma Municipal Code sections 13.05 (land use permit procedures) and 13.06.640 (conditional use permit) govern the process for applying for and obtaining a CUP. *Declaration of Shirley Schulz*, ¶ 4. Under the Ordinance, detention centers like the NWDC may apply for CUPs. *Id.* at ¶ 7–8. The process takes around ninety to one-hundred-twenty days. *Id.* at ¶ 9.  Once completed, a Hearing Examiner will either approve, approve with conditions, or deny the application. *Id.* at ¶ 8. Although this process is partially discretionary and there is no way to predict the outcome, historically most CUP applications in Tacoma are either approved in full or approved with conditions. *Id.*  GEO has not applied for a CUP, a variance or any other permit as of the date of this filing. *Id.* at ¶ 6.

**E.      The City is amending the scrivener's error**

Some of GEO's facts and its Equal Protection claim depend on a scrivener's error that is already being legislatively corrected. The City unequivocally intended the Ordinance apply to *both* correctional and detention facilities. *Victor Decl.*, ¶¶ 2-3. Unfortunately, this intent was erroneously transcribed, resulting in a documentation error that appeared in the final adopted Ordinance. *Id.* The City was unaware of the error until it received the GEO's Complaint in this case. *Id.* The City has since initiated the process of correcting the error

KEATING, BUCKLIN & MCCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

through passing a clarifying amendment. *Id.* at ¶ 5. The clarifying amendment to the ordinance is scheduled for first reading and public comment on August 27th, 2019 and second reading and public comment on September 10, 2019. *Id.* it will become effective on September 14th, 2019. *Id.*

### III.     PROCEDURAL HISTORY

The hallmark of this litigation has been GEO's constant struggle to circumvent or distance its case from the ripeness requirement.

**A.     GEO's early motion to bifurcate reflected a desire to distance itself from the "actual injury" requirement**

The Court may recall GEO's early motion to bifurcate and stay its damages case, which was apparently driven by a desire to avoid a discussion of how GEO was harmed by the Ordinance (since, as the Court later ruled, it was not). *See,* Dkt. No. 17. The motion was dressed up in language about saving "the parties and the Court resources by rendering the damages issue moot." *Id.* at 2:20-22. The reality is that this somewhat bizarre motion was necessitated by an early recognition of what the City contends is an insurmountable, procedural obstacle facing GEO: the lack of ripeness. The Court denied the motion to bifurcate and stay the damages case. Dkt. No. 24.

**B.     GEO abandoned its contractual interference claim when faced with discovery requests**

The City propounded numerous discovery requests designed to gather information about how GEO has been harmed by the Ordinance, if at all. *See,* Dkt. No. 38, Exs. B & F. When confronted with these difficult questions, and only after months of delay, GEO decided to simply abandon the claim on which it premised this lawsuit: interference with the ICE contract. *See,* Dkt. No. 38-5 and. 43 ("The Amended Complaint removes GEO's allegations in support of its prior claim for damages and otherwise makes clear that GEO is not pursuing damages based on its contract with the United States Immigration and Customs Enforcement.").  This concession provides further evidence that GEO "jumped the gun" filing this lawsuit, assuming ICE would not renew the Contract due to the Ordinance. but

DEF'S CROSS-MOT. FOR M.S.J. - 9
3:18-cv-05233-RBL

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

having zero evidence to support that assumption.

**C.**     **The court dismissed GEO'S damages case on ripeness**

After repeated failed attempts to address the issue through discovery, the City filed a motion for partial summary judgment on damages. *See,* Dkt. No. 37. GEO's response was, oddly, that "[a]lthough the City is correct that GEO has not yet suffered damages as a result of the City denying any land use approval… this is not part of GEO's damages claim." *Id.* This admission was tempered by the same arguments GEO makes now: A CUP requires a $5,000 application fee, which represents about .01% of the approximately $50,000,000 "guaranteed minimum" GEO receives for "detention bed days." *See,* Dkt. Nos. 50, 16:1; 51-1, p. 3; 40, 8:17.   In the end, the Court's Order encompassed the City arguments briefed below; that "none of these cases support GEO's claim that one who might someday be damaged by an unconstitutional zoning or permitting law can survive a pending summary judgment by relying only on the possibility of future damages." Dkt. No. 48 at 5:1-3. The Court granted the City's Motion and dismissed GEO's damages case with prejudice. *Id.*

## IV.     ARGUMENT

The City respectfully moves for summary judgment in its favor. *See,* Fed. R. Civ. P. 56. A motion for summary judgment should be granted if there is no genuine issue of material fact. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48; 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of informing the Court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-moving party to produce evidence supporting its claims. *Id.* Rule 56(e) provides that a party opposing summary judgment may not rest upon mere allegation or denials of his pleading but must set forth specific facts showing that there is a genuine issue for trial.  *Anderson*, 477 U.S. at 256. "Hence the nonmoving party may not merely state that it will discredit the moving party's

DEF'S CROSS-MOT. FOR M.S.J. - 10
3:18-cv-05233-RBL
1035-00009/450908.docx

KEATING, BUCKLIN & MCCORMICK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

evidence at trial and proceed in the hope that something can be developed at trial in the way of evidence to support its claim. Instead, it must produce at least some "significant probative evidence tending to support the complaint." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (internal citations omitted).

Nor can a party rely on "conclusory, speculative testimony in affidavits," to defeat summary judgment. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir.2007); see also *Nelson v. Pima Community College*, 83 F.3d 1075, 1081–82 (9th Cir.1996) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment"). If the nonmoving party fails to show that there is a genuine issue for trial, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323.[7]

As discussed below, the material facts cannot reasonably be disputed and the law supports summary judgment in the City's favor, both on ripeness grounds and, alternatively on the Supremacy Clause, preemption, declaratory judgment, injunction and § 1988 fee claims Plaintiff raises in its Motion.  This Argument will proceed in two parts. *First*, the City will address standing/ripeness issues, which should end the inquiry as to all claims made. *Second*, if the Court finds Plaintiff's claims are ripe, the City requests summary judgment on GEO's claims regarding (1) federal preemption, (2) the Supremacy Clause/intergovernmental immunity, (3) declaratory/injunctive relief, and (4) §1988 fees.

**A.     Plaintiff has no standing to bring claims here[8]**

As the Court explicitly recognized in dismissing Plaintiff's damages claim, "GEO is many steps from having an actual permit-based damages claim," and "*potential* damages…flowing from a permit it has not yet applied for, and which is not the subject of any final decision, are not recoverable."  Dkt. No.48, 6:5-9 (*citing Kinzli v. Santa Cruz*, 818 F.2d 1449, 1453 (9th Cir.1987)).  The same concepts and case law also apply to its claims for

---

[7] That the parties have agreed to forego further discovery pending the Court's ruling is strong evidence that the Court is facing purely legal issues. The practical reality is that the Court's ruling on these Cross-Motions will effectively end this lawsuit's trial court phase. If the City wins on ripeness, then this case is over. If GEO wins on its claims, the Court will have invalidated the Ordinance.

[8] The City pled exhaustion of administrative remedies, standing, *and* ripeness in its Answer and Affirmative Defenses. Dkt. No. 10, p. 11 (Affirmative Defenses 2, 6, & 7).

DEF'S CROSS-MOT. FOR M.S.J. - 11
3:18-cv-05233-RBL

1035-00009/450908.docx

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

injunctive and declaratory relief; in the absence of any attempt to even *inquire*, let alone obtain a *final determination*, as to how the Ordinance may ultimately be applied to Plaintiff's property, its claims for declaratory and injunctive relief are premature.  In the same way the Court held that failure to apply for a permit means GEO has suffered no monetary damages, it also means there has been no constitutional or other justiciable deprivation for which they are entitled relief.  GEO has failed to present an actual "case or controversy" as required under 28 USC. § 2201, failed to establish standing for declaratory or injunctive relief, and its claims should be dismissed.

1.     **Pursuit of administrative remedies is generally required prior to *any* lawsuit**

One of the basic tenets of Washington law, and of American law in general, is the requirement that a putative plaintiff exhaust all available administrative remedies before filing a lawsuit.  More than 30 years ago, the Washington State Supreme Court noted that "the cases make clear there is a strong bias towards requiring exhaustion before resort to the courts." *Orion Corp. v. State*, 103 Wash. 2d 441, 456–57, 693 P.2d 1369, 1378 (1985).  This bias led the courts to recognize "a general rule that when an adequate administrative remedy is provided, it must be pursued before the courts will intervene."  *Id*. (*citing Wright v. Woodard*, 83 Wash.2d 378, 381, 518 P.2d 718 (1974).  In other words, "If the administrative mechanisms available can alleviate the harmful consequences of the governmental activity at issue, a litigant must first pursue those remedies before resort to the court."  *Id*.  The *Orion* court explained the four main policies underlying this rule:

> to (1) insure against premature interruption of the administrative process, (2) allow the agency to develop the necessary factual background on which to base a decision, (3) allow the exercise of agency expertise, (4) provide a more efficient process and allow the agency to correct its own mistake, and (5) insure that individuals are not encouraged to ignore administrative procedures by resort to the courts.

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE:  (206) 623-8861
FAX:  (206) 223-9423

*Id*. (*citing South Hollywood Hills Citizens Ass'n v. King Cy.*, 101 Wash.2d 68, 73, 74, 677 P.2d 114 (1984).

Importantly, given the highly-administrative nature of the land use process, as well as the multi-faceted administrative review process for the application of zoning ordinances to a particular property, our courts have held that the requirement to exhaust all administrative remedies – *i.e.*, actually apply for permits and receive a decision from the local government – prior to filing suit, "is particularly true in land use cases where the matter involved an act of legislative discretion." *Id*. Our courts have applied this rule again and again to reject claims regarding zoning ordinances where the plaintiffs failed to first apply for permits, variances, or otherwise attempt to obtain a final determination as to how a particular ordinance may actually be applied to a particular piece of property. *Lange v. Woodway*, 79 Wash.2d 45, 483 P.2d 116 (1971) ("If such alleviation [*i.e.*, a CUP, variance, or other approval] is available, then one must seek it before he will be heard to say that the ordinance injuriously affects him."); *Ackerley Communications, Inc. v. Seattle*, 92 Wash. 2d 905, 908, 602 P.2d 1177, 1180 (1979) (rejecting challenge to zoning ordinance where plaintiffs "failed to exhaust their administrative remedies and show conclusively that the ordinance they challenge will harm them.").

### 2. Application for a permit is a threshold issue of ripeness/standing in land use cases

Plaintiff may argue that while a landowner is required to apply for permits and obtain final decisions in run-of-the-mill land use disputes, allegations of federal constitutional derivations somehow supplant such local administrative requirements; *i.e.*, that an administrative solution would not resolve the alleged constitutional problem with the Ordinance, so applications should not be required. That argument has been considered and rejected numerous times by both federal and state courts alike and must be rejected here. Not

KEATING, BUCKLIN & MCCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

only have our courts held that actual applications and decisions are required in cases alleging zoning-based constitutional deprivations, they held that it applies <u>especially to such cases</u>.

As an initial matter, the courts have recognized that in the context of land use disputes – and zoning disputes in particular – requiring a landowner to receive a final decision from the local government is not merely an "exhaustion of administrative remedies" issue; rather, it is a threshold issue of <u>standing</u>. That is, while in many contexts exhaustion of administrative remedies is required to determine whether some non- or quasi-judicial mechanism can redress *harm that has already been suffered* by the plaintiff. But in the land use context, the permitting/variance process will determine *whether any harm has been suffered* in the first place; *i.e.*, whether there is even a "case or controversy" as required for standing under Article III. For example, the *Lange* court admitted that while the "administrative variance procedure" might not resolve the constitutionality of the ordinance, it would determine whether Plaintiff had suffered any harm sufficient to confer standing:

> The fact that administrative variance procedures do not address themselves to the underlying constitutional validity of the ordinance in question has no bearing on the question of whether a party has standing to urge the unconstitutionality of the ordinance in the courts. The question is not whether the administrative procedure can respond to the charge of unconstitutionality, but whether the procedure can alleviate any harmful consequence of the ordinance to the complaining party.

*Id.*

The federal courts have likewise held that absent permit applications, a plaintiff can show no "final decision by the government agency that inflicts a concrete harm on the landowner," and therefore cannot establish standing to bring any constitutional claim. *Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1232 (9th Cir.1994). This rule is based on the general threshold requirement that "[i]n order for a case to be justiciable under Article III of the Constitution, it must be ripe for review." *Aydin Corp. v. Union of India*, 940 F.2d 527, 528 (9th Cir.1991). "A claim is not ripe if it involves 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *United States v. Streich*, 560 F.3d

DEF'S CROSS-MOT. FOR M.S.J. - 14
3:18-cv-05233-RBL
1035-00009/450908.docx

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

926, 931 (9th Cir.2009) (quoting *Thomas v. Union Carbide Agric. Prods. Co*., 473 U.S. 568, 580–81 (1985)). "For a suit to be ripe within the meaning of Article III, it must present concrete legal issues, presented in actual cases, not abstractions." *Colwell*, 558 F.3d at 1123. "The ripeness doctrine demands that ... litigants' asserted harm is 'direct and immediate' rather than speculative or hypothetical." *Hillblom v. U.S.*, 896 F.2d 426, 430 (9th Cir.1990).

The Supreme Court has explicitly held that when it comes to constitutional allegations involving zoning ordinances, "[o]ur cases uniformly reflect an insistence on knowing the nature and extent of permitted development before adjudicating the constitutionality of the regulations that purport to limit it." *MacDonald, Sommer & Frates v. Yolo Cty.*, 477 U.S. 340, 351, 106 S. Ct. 2561, 2567, 91 L. Ed. 2d 285 (1986); *see also Public Utilities Comm'n of California v. United States*, 355 U.S. 534, 539-40, 78 S.Ct. 446, 450, 2 L.Ed.2d 470 (1958) ("If … an administrative proceeding might leave no remnant of the constitutional question, the administrative remedy plainly should be pursued.") Specifically, the federal courts have repeatedly applied this standard to the exact claims Plaintiff brings here, holding that "[o]ur decisions in this area have also clarified that we will apply the same ripeness standards to equal protection and substantive due process claims." *Herrington v. Cty. of Sonoma*, 857 F.2d 567, 568–69 (9th Cir.1988) (requiring prior permit applications before claiming a zoning ordinance violated substantive due process and/or equal protection); *citing Kinzli v. City of Santa Cruz*, 818 F.2d 1449, 1456 (9th Cir.), *amended*, 830 F.2d 968 (9th Cir. 987) (affirming dismissal of due process claims because plaintiffs must "first obtain final decisions regarding the application of the regulations to their property and the availability of variances."); *accord Shelter Creek Dev. Corp. v. City of Oxnard*, 838 F.2d 375, 379 (9th Cir.1988) ("The landowners' equal protection claim is not ripe for consideration by the district court until planning authorities and state review entities make a final determination on the status of the property. The landowners' equal protection claim therefore is not ripe, just as their taking claim is not ripe.").[9]

---

[9] Just two months ago, the Supreme Court made this distinction in overruling the traditional rule that state inverse condemnation procedures must be exhausted before a plaintiff could file a Fifth Amendment Takings

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

1   Without any application or final decision on how the Ordinance will be applied to
2   Plaintiff's property, their constitutional claims fail for a lack of ripeness.

3   **3.**   <u>**The same ripeness/standing analysis is required for declaratory relief**</u>

4   The same ripeness/standing requirements for constitutional challenges to zoning
5   ordinances apply with equal force to claims under 28 USC § 2201 for declaratory relief. That
6   statute, which authorizes a declaratory judgment action to address federal questions, only
7   applies "in a case of actual controversy within [federal] jurisdiction." 28 USC § 2201(a). The
8   purpose of the Declaratory Judgment Act is to "enable a person who is reasonably at legal
9   risk because of an unresolved dispute, to obtain judicial resolution of that dispute without
10  having to await the commencement of legal action by the other side." *BP Chemicals Ltd. v.*
11  *Union Carbide Corp.*, 4 F.3d 975, 977 (Fed. Cir. 1993). The controversy alleged "must be
12  actual, not hypothetical or of uncertain prospective occurrence. The requirement of actual
13  controversy encompasses concepts such as ripeness, standing, and the prohibition against
14  advisory judicial rulings." *Id*. Accordingly, a district court must determine at the outset
15  whether the parties have presented an actual case or controversy within the court's
16  jurisdiction. *Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 669 (9th Cir.2005).

17  Federal courts across the country have repeatedly applied this standard in cases like
18  the one GEO brings here, holding that a plaintiff must "first obtain[s] final decisions
19  regarding the application of the regulations to their property." *Kinzli*, 818 F.2d at 1456; *see*
20  *Mountain Valley Pipeline, LLC v. Wender*, 337 F.Supp.3d 656 (S.D.W.Va. 2018) ("actual
21  controversy" existed after county denied application to re-zone company's property);
22  *McLarty v. Borough of Ramsey*, 166 F.Supp. 291 (D.N.J.1958) (no "actual controversy" as
23  to constitutionality of zoning ordinance where plaintiff failed to apply for a building permit).

24  _____

25  claim in federal court. *Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162, 2168 (2019). The Court noted
    that in a takings case, the constitutional violation occurs at the moment the property is "taken" without just
26  compensation, regardless whether the plaintiff subsequently seeks or receives compensation for that violation.
    Because the tradition application/decision requirement in cases of due process/equal protection allegations do
    not seek to compensate for a constitutional deprivation that has already occurred, but rather as the only rod by
27  which to gauge whether such a deprivation has occurred in the first place, the *Knick* Court left intact such a
    requirement claims like those presented here that do not involve Takings claims.

DEF'S CROSS-MOT. FOR M.S.J. - 16
3:18-cv-05233-RBL

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

1035-00009/450908.docx

Without an actual application by a landowner, and a final decision by the governing authority, the landowner is at no risk of "commencement of legal action by the other side," and the entire purpose of the Declaratory Judgments Act is mooted. *See BP Chemicals*, *supra*.

**4.**  **Based on the case law, GEO's claims must be dismissed because they have failed to apply for any permit or variance whatsoever**

Based on the case law addressed above, GEO's claims for declaratory relief must be dismissed, as they have presented no actual judicial controversy. As this Court has already explicitly held in this case, Plaintiff's claims are premised entirely on "a permit it has not yet applied for, and which is not the subject of any final decision." Dkt. No. 48, 6:8-9. In making that observation, the Court cited *Kinzli v. Santa Cruz*, 818 F.2d 1449, 1454 (9th Cir.1987), which is almost factually identical to the present case, and should control here.

In *Kinzli*, the City passed an ordinance establishing a greenbelt, severely limiting the type of development allowed on parcels subject to the ordinance. *Id*. The Kinzlis, who owned property within the newly-established greenbelt, applied for a residential development permit, but withdrew it when a City official informed them no water service was available at the property. *Id*. Just as GEO has done here, the Kinzlis sued in federal court, claiming "their substantive due process rights were violated by the City's restrictions on their property" and that the ordinance was "a violation of their right to equal protection." *Id*. at 1456. The district court found that no constitutional violation had occurred and dismissed the claims.

The Ninth Circuit not only affirmed dismissal of the claim, but further held the lower court should never even have reached the merits of the claim. The Court reiterated the long-standing principle that in order to claim a zoning ordinance has denied a landowner substantive due process, the landowner must have received a "final decision" on how the ordinance will be applied to the property in question. *Id*. at 1455. The Court held that the Kinzlis "failed to secure a final decision from the City regarding acceptable uses" because they "have neither submitted a development plan nor applied for a variance." *Id*. Consequently, the Court held that "the substantive due process claim was unripe," reiterating again that "this conclusion is compelled by the absence of a meaningful application for

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

development of the property." *Id*. at 1455, 1457.[10]  The Court similarly disposed of the equal protection claim, holding that "the Kinzlis' equal protection claim is not ripe for consideration by the district court until planning authorities and state review entities make a final determination on the status of the property."[11]  *Id*. at 1455-56 (*quoting Norco Const., Inc. v. King Cty.*, 801 F.2d 1143, 1145 (9th Cir.1986) ("denial of equal protection or denial of due process…are not matured claims until planning authorities and state review entities make a final determination on the status of the property.")).

In *Ackerley Commc'ns, Inc. v. City of Seattle*, 92 Wash.2d 905 (1979), the plaintiff owned a number of billboards in and around the City of Seattle.  Eventually, Seattle passed an ordinance regulating the size and placement of such billboards along certain state highways, allowing a 3-year amortization period prior to enforcement.  Just as GEO has done here, Ackerley "sought declaratory judgments that the Ordinance was in conflict with the state law and unconstitutional." *Id*. at 907.  The City argued that Ackerley had never sought an extension of the amortization period, which was explicitly allowed under the Ordinance, and never applied for a variance. *Id*.  The Supreme Court agreed with the City, holding that the plaintiffs "have no standing to maintain an action for declaratory and injunctive relief for they have failed to exhaust their administrative remedies and show conclusively that the ordinance they challenge will harm them." *Id. at 908*.  Responding to plaintiff's claim that administrative remedies are not required prior to making constitutional allegations, the Court quoted *Lange*, *supra*, pointing out it was not a question of "remedy" in this context, but a threshold question of "standing."  For example, an individual need not exhaust administrative remedies prior to raising constitutional issues as a defense in a judicial proceeding to enforce an administrative rule: "the party has no need to show it is harmed by administrative action because it is already a defendant in enforcement proceedings." *Id*.  In contrast, "[w]here a

---

[10] The Court held that the initial development application "was not meaningful since it was abandoned at an early stage in the application process." *Id*. at 1455.

[11] Importantly, the *Kinzli* court held that a "final decision" requires at least two decisions against the landowners: (1) a rejected development plan, and (2) a denial of a variance. *Id.* at 579. GEO has neither obtained nor requested either here.

DEF'S CROSS-MOT. FOR M.S.J. - 18
3:18-cv-05233-RBL

1035-00009/450908.docx

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

party affirmatively seeks declaratory or injunctive relief, however, it must show that its remedies have been exhausted in order to show it has standing to raise even a constitutional issue." *Id*. at 908-909.

Finally, in *Lange v. Woodway*, 79 Wash.2d 45, the plaintiff's property was incorporated in the Town of Woodway, which eventually passed zoning ordinances restricting the minimum lot size, thereby lowering the number of lots into which plaintiff could subdivide his parcel. *Id*. The plaintiff sued, seeking a declaratory judgment that the zoning ordinance was null and void. The Town countered that he should not be able to challenge the ordinance because it was not ripe. The State Supreme Court agreed with the Town, holding that "[i]f one cannot show that enforcement of the challenged ordinance harmfully affects him, then he has no standing to challenge the constitutionality of that ordinance. This has long been our rule" *Id*. at 48; *citing State v. Human Relations Research Foundation*, 64 Wash.2d 262, 391 P.2d 513 (1964); *State v. Lundquist*, 60 Wash.2d 397, 374 P.2d 246 (1962); *Galvin v. State Tax Comm'n*, 56 Wash.2d 738, 355 P.2d 362 (1960); *Kitsap County v. Bremerton*, 46 Wash.2d 362, 281 P.2d 841 (1955); *State ex rel. Hansen v. Salter*, 190 Wash. 703, 70 P.2d 1056 (1937); *State v. Charrier*, 151 Wash. 654, 276 P. 878 (1929).

As the City's own Principal Planner makes clear in her declaration, there are a variety of ways Plaintiff here could seek to expand or alter their existing use, and eventually obtain a final decision from the City on how the Ordinance will be applied to Plaintiff's property in particular. *See Schultz Declaration*. For example, GEO could apply for a conditional use permit, a process explicitly intended for "the review of uses which may be appropriate in a given zoning district, but because of scale, operational characteristics, or potential for off-site impacts, warrant some additional review, public process, and conditional review on a case-by-case basis." *Id*. at ¶ 4. As Ms. Schultz makes clear, GEO is legally "entitled to apply for a CUP for its Northwest Detention Center under Ordinance No. 28491." *Id*. Importantly, Ms. Schultz is explicit that "most such applications to the City are either approved or – most frequently – approved with conditions (which is why they are called "conditional" use

KEATING, BUCKLIN & MCCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

permits.).” *Id*.  Or, GEO could simply apply for a variance – as any landowner is allowed to do – which could potentially allow it to entirely avoid some of the specific impacts claimed in its *Complaint*.  The variance process is simple, straightforward, and certainly well-known to the experienced land use attorneys working for Plaintiff GEO here.  However, the simple fact it that GEO has failed to submit any sort of application for any development permit, conditional use permit, variance, or any other permit or proceeding necessary to determine how the Ordinance could possibly be applied to its property.

Importantly, in contrast to almost every single case addressing similar allegations, the Ordinance at issue here has no effect whatsoever on what GEO is currently doing with its property.  Under the Ordinance, it is legally authorized to keep the exact same structures, in the exact same places, doing the exact same things.  The Ordinance does not require anything to be moved or altered in any way and has no impact whatsoever on Plaintiff's ability to continue making the income it makes from the property.  Plaintiff's sole complaint is that the Ordinance *might* prevent or limit it from making some *unspecified* change, for which they may have to undergo some *potential future* development process, based on an *unspecified* contract requirement by a federal agency that *may or may not* be implemented at an *unspecified* time in the future.  Under the clearly-established case law, GEO has no standing to challenge the Ordinance at issue here, let alone claim it is unconstitutional or subject to declaratory or injunctive relief in federal court, and the claims should be dismissed.

**B.**     **Plaintiff's partial summary judgment motion should be denied and the City given summary judgment on the issues in Plaintiff's motion**

Even ignoring the case law, and assuming *arguendo* that Plaintiff has standing to bring this case, Plaintiff's claims fail on their merits and should be dismissed. Our courts have long recognized that the inherently local and administrative nature of land use ordinances, and the disputes that arise therefrom, are particularly deserving of judicial abstention until the final legal relations of the parties have been settled.  In *Lange*, *supra*, our State Supreme Court observed even the state judiciary's general “reluctance to invoke and

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

apply constitutional considerations where other means of redress are available," noting that such reluctance "<u>finds added reason in zoning cases</u> where the matter in question is the substance of an act of legislative discretion, which cases call into play the respect due from courts for a co-ordinate branch of government." *Lange*, 79 Wash.2d at 48 (emphasis added); *see also Chestnut Hill Co. v. Snohomish*, 76 Wash.2d 741, 458 P.2d 891 (1969); *State ex rel. Myhre v. Spokane*, 70 Wash.2d 207, 422 P.2d 790 (1967).

For their part, the federal courts are even more reticent to involve themselves in the inherently-local nature of zoning disputes, looking with suspicion on plaintiffs' attempts to turn local zoning issues into constitutional claims. The Ninth Circuit has observed that "ruling case law makes it very difficult to open the federal courthouse door for relief from state and local land-use decisions," and has recognized that the "Supreme Court has erected imposing barriers…to guard against the federal courts becoming the Grand Mufti of local zoning boards." *Hoehne v. Cty. of San Benito*, 870 F.2d 529, 532 (9th Cir. 1989) (*citing MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986)). Given this understandable reluctance to become the zoning board of last resort, and in light of the case law discussed below, the Court should deny Plaintiff's Motion and enter summary judgment in the City's favor on the claims raised in Plaintiff's Motion for Partial Summary Judgment.[12]

### 1.    Plaintiff's "Intergovernmental Immunity" / "Supremacy Clause" claim should be dismissed

All of GEO's claims rely on a single – and singularly false – premise; that its contractual relationship with ICE somehow elevates it above local and state law. This mistake pervades and undermines GEO's analysis at every step, including its flawed governmental immunity claim. The doctrine of governmental immunity is rooted in the Supremacy Clause, which guarantees that "the activities of the Federal Government [be] free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). "Courts take

---

[12] By so moving, the City does not waive its right to seek dispositive relief on Plaintiff's other claims; the City expressly reserves the right to seek dismissal of those claims at a later date in a separate motion.

DEF'S CROSS-MOT. FOR M.S.J. - 21
3:18-cv-05233-RBL

1035-00009/450908.docx

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

'a functional approach to claims of governmental immunity, accommodating [ ] the full range of each sovereign's legislative authority.' " *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir.2010), citing *North Dakota v. United States*, 496 U.S. 423, 435 (1990). State laws are invalid only if they "regulate the United States directly or discriminate against the Federal Government or those with whom it deals." *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir.2014).

"The nondiscrimination rule finds its reason in the principle that the States may not directly obstruct the activities of the Federal Government." *North Dakota*, 495 U.S. at 437-38. "A state or local law discriminates against the federal government if it treats someone else better than it treats the government." *Boeing*, 768 F.3d at 842. "Since a regulation imposed on one who deals with the [Federal] Government has as much potential to obstruct the governmental functions as a regulation imposed on the Government itself ... the regulation [must] be ... imposed on some basis unrelated to the object's status as a Government contractor or supplier, that is, that it be imposed equally on other similarly situated constituents of the State." *Id.* at 438. GEO cannot prevail on its intergovernmental immunity claim because the Ordinance does not obstruct the federal government; nor does it discriminate against the federal government, GEO or the NWDC.

GEO recently argued in favor of applying intergovernmental immunity in *Washington v. GEO Group, Inc.*, (Case No. 3:17-cv-05806-RJB), and Judge Bryan again rejected its arguments, just as this Court should do here.  *Washington v. Geo Group, Inc.*, 2018 WL 6448778 *3 (W.D. Wash. 2018). In that case the State sought a declaration that the Washington Minimum Wage Act (MWA) applies to the compensation of certain immigration detainees at the NWDC and asked that GEO be enjoined from compensating detainees below the prevailing minimum wage (they were being paid $1 per day).  Judge Bryan concluded the City's ordinance did not "regulate the United States directly" nor did it "discriminate against the Federal Government or those with whom it deals."  *Id.*  Judge Bryan has since ruled on cross-motions for summary judgment in *State v. GEO*. 2019 WL 3565105, at *5 (W.D. Wash.

KEATING, BUCKLIN & MCCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

Aug. 6, 2019)[13]. Judge Bryan rejected GEO's contractor immunity argument. A contractor is entitled to immunity when it performs work "authorized and directed by the Government of the United States." *Id.*, at 673; 2019 WL 3565105, at *5 (W.D. Wash. Aug. 6, 2019); *Campbell-Ewald Co. v. Gomez.* 136 S. Ct. 663, 672, 193 L. Ed. 2d 571 (2016), *as revised* (Feb. 9, 2016). Judge Bryan reasoned that "GEO has not shown that it was directed (by the U.S.) to pay participants in the VWP only a $1 for the relevant period." *Id.* Likewise here, GEO has not shown how the Ordinance has impacted any directive it has received from ICE or impaired any federal objective.

GEO argues both that Ordinance 28491 directly regulates the United States, and that it discriminates against the government. Just as these arguments failed in Judge Bryan's courtroom, so should they fail here.

### a.     The Ordinance does not directly regulate the United States

The private, contractor-owned and -operated NWDC is subject to the zoning requirements of the City of Tacoma, which include Ordinance 28491. The City's Ordinance does not interfere in the operations of the NWDC whatsoever. The Ordinance does not attempt to regulate how detainees are treated in the facility, nor is it regulating any way in which the NWDC conducts its business.  Under the intergovernmental immunity component of the Supremacy Clause, states may not directly regulate the Federal Government's operations or property. *Blackburn v. U.S.*, 100 F.3d 1426, 1435 (9th Cir.1996). The Ordinance does not directly (or indirectly) regulate the NWDC's operations; it merely requires a CUP for future (entirely hypothetical) expansion of that facility.[14]

The case of *Boeing v. Movassaghi*, 768 F.3d 832, 836 (9th Cir.2014), so heavily relied upon by GEO, is inapposite. There, the State of California enacted a bill which put specific requirements and restrictions on the nuclear clean-up to be performed by the federal

---

[13]  For the Court's convenience, Judge Bryan's rulings are included in Appendices B & C.

[14]  Plaintiff's motion includes the bizarre, and utterly unsupported statement that "the state or local regulation need not specifically target a federal actor or activity, but instead must merely include the federal government within its scope."  *Pltff's Motion*, at 8:24-25. There is no basis whatsoever for this claim -- that no local government may pass any ordinance that includes any "federal actor" within its scope.

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

government, through its contractor, Boeing. The court held that this constituted a direct regulation on the federal government. Here, there is no such regulation—the City is not instructing Plaintiff on how its detention center should be managed, operated, organized or run; nor is it the City affecting or limiting the NWDC's operations in any way. Simply put, "[t]he Ordinance does not in any way limit, prevent, or prohibit the existing operations of NWDC." *Settle Report*, ¶ 1.4. In an analogous land use and permitting context, one court found that intergovernmental immunity did not apply:

> Without a Congressional mandate that the Government's immunity be extended beyond its own property and instrumentalities, the Court is faced with a situation similar to that described by the Third Circuit in *United States v. Pennsylvania Environmental Hearing Board*, supra:
>
> ". . . the Government has deliberately opted for the 'genius' of private enterprise . . . . In so choosing, the Government enjoys the benefits that are derived from private operation, but by the same measure, it must also suffer any reciprocal burdens. One of these burdens is the responsibility of (the private entity's) compliance with state . . . regulations." 584 F.2d at 1279.
>
> Accordingly, the Supremacy Clause and the federal law do not bar the defendants' enforcement against CE or its agents of the building code requirements, including the collection of the building permit fee in the amount set aside in trust pursuant to the parties' stipulation.

*U.S. v. Town of Windsor*, 496 F. Supp. 581, 592 (D. Conn. 1980).[15]

*U.S. Postal Service v. City of Hollywood*, 974 F. Supp. 1459 (S.D. Fla. 1997), also relied upon by Plaintiff, is not even an intergovernmental immunity case. It makes no mention of the doctrine. Further, it only discusses the heavily regulated area of the U.S. Postal Service, and the plethora of cases in which the postal laws have conflicted with local laws. It simply has no application here. This is not a situation where a municipal ordinance is seeking to preclude the opening of new post offices (or even new detention centers). *See e.g., United States Postal Serv. v. Greenwich,* 901 F.Supp. 500, 505 (D.Conn.1995). The NWDC is open for business, and the Ordinance does nothing to impact the NWDC or its operations.

---

[15] *See also, United States v. Boyd*, 378 U.S. 39, 44-48, 84 S.Ct. 1518, 12 L.Ed.2d 713 (1964) (the use of Government-owned property by a federal contractor for profitable activities is a taxable activity, even if the tax is finally borne by the United States); *Keifer & Keifer v. Reconstruction Finance Corp.*, 306 U.S. 381, 59 S.Ct. 516, 517, 83 L.Ed. 784 (1939) ("the government does not become the conduit of immunity in suits against its agents or instrumentalities merely because they do its work").

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

Furthermore, the Ordinance does **not** categorically prohibit any expansion or major modification of the NWDC.[16]  As the City's land use expert notes:

> The quoted City Code provisions allow changes in nonconforming structures and uses subject to typical, reasonable limitations, and allow expansion that would not increase traffic and parking by more than 10% as a matter of right, subject to reasonable performance standards, and expansion to an unlimited extent through a conditional use permit process.

*Settle Report*, at ¶ 1.4 (emphasis added).

Next, GEO argues that even if the Ordinance does not categorically prohibit NWDC modifications, "it still purports to regulate any such activity." What activity?  The Ordinance does not regulate the government or GEO or the NWDC in its operations or the detainment of people awaiting immigration proceedings. And Plaintiff's arguments related to seeking a CUP are purely speculative, **because they have never submitted an application or gone through the process**. GEO's arguments lack factual and legal merit.

> Although GEO characterizes the requirements of compliance with the City's nonconforming use and structure regulations and potentially the City's conditional use permit process in order to expand existing correctional and detention facilities, including NWDC, as unusually burdensome and unduly oppressive, ***these requirements are not unusual at all, in my expert opinion, but normal and commonplace among Washington cities and counties***.

> While GEO's amended complaint implies that the City imposed nonconforming use status on NWDC, this assertion is misleading. The Ordinance simply established updated regulations for correctional and detention facilities in the City. For proposed new facilities in the M-1 zone where now permitted by the Ordinance, such new uses would be conforming, not nonconforming. While a conditional use permit (CUP) would be required for such new facilities, requiring CUPs for such facilities is commonplace, not unusual, and certainly not unlawful.

*Settle Report*, at ¶ 1.4.

Plaintiff also cites to *U.S. v. California*, 921 F.3d 865, 883 (9th Cir.2019) in support of its immunity claim. Again, this case proves the very points the City is advancing here. The *California* case involved a series of laws that protected Californian residents from federal immigration enforcement, for example, a law that required employers to alert employees

---

[16] *Plaintiff's Motion*, at 10:11-13.

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

before federal immigration inspections. *Id.* at 872. The Ninth Circuit rejected the United States' argument that the State's law requiring employee-notice violated intergovernmental immunity. *Id.* at 880. The Ninth Circuit held the state law did "not treat the federal government worse than anyone else; indeed, it does not regulate federal operations at all." *Id.* at 881. The Ninth Circuit drew a distinction between the employee-notice requirement and another law allowing the State to inspect immigration detention facilities. *Id.* at 882. This put a specialized burden on federal activity and was rendered unlawful. *Id.*  Here, the Ordinance does not place any specialized burden on federal activity whatsoever.

### b.    The Ordinance does not discriminate against the NWDC or GEO

Similar to here, Plaintiff unsuccessfully moved for summary judgment in *Washington v. Geo Group*, *Inc*., *supra*, on the basis that it was the subject of federal contractor discrimination. This Court should dismiss that claim for at least three reasons.

First, like the Minimum Wage Act implicated in *Washington v. GEO*, the City's Ordinance here applies equally to other similarly situated facilities in the City, *i.e.*, all detention and correctional facilities, <u>regardless of federal contractor status</u>. *Settle Opinion*, ¶ 1.3.[17] The City's choice of regulatory methods was well within its broad statutory authority and discretion. Regulating such facilities through a CUP process rather than a building permit alone is frequently done so compatibility can be enhanced through permit conditions and public participation can be increased. *Id*. at ¶ 2.7. It cannot be said that the Ordinance "meddl[es] with federal government activities indirectly by singling out for regulation those who deal with the government." *Washington v. GEO*, at *3. The Ordinance applies equally to all defined detention and correction facilities[18] and does not only apply specifically to the NWDC. *Settle Report*, at ¶ 1.3.

---

[17] The City has acknowledged a scrivener's error in Ordinance No. 28491. *See Victor Decl*. at ¶ 3. Otherwise the Ordinance does not differentially regulate detention and correction facilities. The amendment to limit new or expanded correctional and detention facilities to the M-1 zoning district as it existed as of January 1, 2018, was unambiguously intended to apply to both correctional and detention facilities but was erroneously transcribed in the detention facility box in the Ordinance exhibit. *Id.*, and *Settle Report*, at ¶ 2.5.

[18] *See Victor Decl*. at ¶¶ 4-5.

DEF'S CROSS-MOT. FOR M.S.J. - 26
3:18-cv-05233-RBL
1035-00009/450908.docx

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

*Second*, there is no showing the Ordinance "is imposed against [GEO] on any basis related to its status as a Federal Government contractor." *Id*. (citing *North Dakota*, 495 U.S.at 438). *See, Settle Report*, ¶ 1.3. In *Washington v. GEO*, GEO emphasized that the MWA applied equally to Defendant as a government contractor and to the federal government. The Court held that the GEO's argument on this point was "far too broad and overlooks the Federal Government's discretion to decide whether to extend its cloak of sovereign immunity to contractors, *e.g.*, by terms of a contract." *Id.* at *4. Here, Plaintiff has identified no such provision in its contract with ICE.   And the recitals to the Ordinance and its adopted legislative findings show conclusively that the Ordinance was not enacted to impede GEO's status as a federal government contractor, to impede or restrict its operation of the NWDC, or to discriminate against GEO or the NWDC in any way. The Ordinance does not even mention the NWDC or GEO. *See, Appendix A* generally.

*Third*, the City respectfully suggests the Court carefully consider *U.S. Postal Service v. City of Berkeley*, 2018 WL 2188853 (N.D. Ca. 2018), a zoning case in which the Postal Service sought to declare unlawful and enjoin the application and enforcement of a zoning ordinance enacted by the City of Berkeley on the basis of intergovernmental immunity and conflict preemption. In that case, the U.S. Postal Service contested a zoning overlay, arguing that it applied disparately to the government's property, and thus violated intergovernmental immunity. The Court rejected this argument and held as follows:

> Under the USPS's theory, it would be virtually impossible to impose any local regulation—no matter how objectively or sincerely neutral—on a group of constituents that happened to include the federal government or those with whom it deals, because any deviation in the infinite potential actions and decisions of said constituents might cause the federal government or those with whom it deals to feel the impact of the regulation more keenly than their neighbor and thus violate intergovernmental immunity. Again, the USPS has provided no authority or argument to justify such a sweeping theory.
>
> In short, this order concludes the Overlay imposes the same restrictions on future potential purchasers of the post office that it does on future potential purchasers of other properties in the Civic Center Historic District, and that **the Overlay does not treat any 'similarly situated constituents' better than it does the USPS or those with whom it deals. The Overlay therefore does not violate intergovernmental immunity**.

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

2018 WL 2188853 *4 (emphasis added). Here, the Ordinance treats detention and correctional facilities the same regardless of federal contractor status. Thus, there is no discrimination against the federal government, and the Ordinance does not violate intergovernmental immunity. Plaintiff's Motion on this claim should be denied, and summary judgment should be entered in the City's favor.

### 2. Plaintiff's federal preemption claim should be dismissed

What appears to be driving this lawsuit (and others of its ilk[19]) is GEO's misguided belief that its relationship with the federal government somehow shields it entirely from state and local law.  However, as discussed above, land use and zoning policy has long been considered a feature of local government and an area in which the tenets of federalism are particularly strong. *See, Evans v. Board of County Comm'rs*, 994 F.2d 755, 761 (10th Cir.1993). Our courts have consistently held that a local government has broad power to implement its land use policies by way of zoning classifications. *See, Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 68 (1981). As such, "when considering pre-emption, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Mortier*, 501 U.S. at 605; *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 146–47 (1963) (preemption of regulation enacted pursuant to police power will not occur "in the absence of an unambiguous congressional mandate to that effect"); *Bldg. & Constr. Trades Council v. Associated Builders & Contractors*, 507 U.S. 218, 224 (1993)("Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law.").

These basic principles of federalism, including the recognition that "the States are independent sovereigns in our federal system," *Medtronic*, 518 U.S. at 485, dictate that in the absence of such clear intent, Congress cannot "be deemed to have significantly changed the federal-state balance." *Jones v. United States*, 529 U.S. 848, 860 (2000) (Stevens, J.,

---

[19] *See, e.g., STATE OF WASHINGTON, Plaintiff, v. THE GEO GROUP, INC., Defendant.*, 17-5806 RJB, 2019 WL 3565105 (W.D. Wash. Aug. 6, 2019).

DEF'S CROSS-MOT. FOR M.S.J. - 28
3:18-cv-05233-RBL

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

concurring) (quoting *United States v. Bass*, 404 U.S. 336, 349 (1971)). Reliance on the presumption against pre-emption limits "congressional intrusion into the States' traditional prerogatives and general authority to regulate for the health and welfare of their citizens." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). Thus, "[i]f the statute's terms can be read sensibly not to have a pre-emptive effect, the presumption controls and no pre-emption may be inferred." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 116–17 (1992) (Souter, J., dissenting).

The burden is on GEO to show that preemption applies because the party seeking to set aside state law bears the burden to show preemption. *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 634 (2011). GEO cannot carry that burden here.

### a. Express preemption does not apply

Again, the recent decision in *Washington v. GEO* is instructive. In a separate summary judgment motion, GEO unsuccessfully argued that federal preemption applied to prevent application of the Minimum Wage Act. In that case, there was an actual express provision in which Congress created a comprehensive scheme prohibiting the employment of undocumented persons in the United States, yet Judge Bryan still found that State minimum wage act was not expressly preempted.

> Express preemption applies where Congress ***explicitly states its intent to preempt state law in the language of a statute***. Where Congress has expressed an intent to preempt state law, the scope of the preemption is determined by examining congressional intent, beginning with the legislative text, which necessarily contains the best evidence of Congress' preemptive intent. Courts also consider the statutory framework, as well as the structure and purpose of the statute as a whole. When the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors pre-emption.

*Washington v. GEO*, 283 F.Supp.3d 967, 975 (W.D. Wash. 2017) (emphasis added).

Here, GEO relies upon 40 U.S.C. § 3312(c), which provides as follows:

> Each building ***constructed or altered by the Administration or any other federal agency*** shall be constructed or altered only after consideration of all requirements (except procedural requirements) of the following laws of a State or a political subdivision of a State…:
> (1) Zoning laws.

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

GEO engages in a superfluous statutory construction analysis arguing why this provision should apply to the privately owned, privately operated NWDC. However, "Canons of statutory construction dictate that *if the language of the statute is clear, we look no further than that language in determining the statute's meaning*." *Avendano-Ramirez v. Ashcroft*, 365 F.3d 813, 816 (9th Cir.2004). The statute's language is crystal clear: it only applies to buildings "constructed or altered by the Administration or any other federal agency." Neither applies here.  This building was constructed by the privately-owned Correctional Services Corp., and ownership was later transferred to GEO. The NWDC is not a "public building" like a post office and is not owned or operated by the federal government.  Plaintiff is wrong when it writes "As with intergovernmental immunity, it is of no moment that the Plaintiff is a private entity contracting its facility to the federal government—for purposes of the Supremacy Clause, federal contractors are treated the same as the federal government itself."[20] This is plainly not true under the United States Code provisions on which GEO relies. Express preemption only applies where Congress <u>explicitly</u> states its intent to preempt state law in the language of a statute. Here, there is no such explicit intent.

Plaintiff's citation to 40 U.S.C. § 3301(b) is nonsensical. That statute pertains to definitions for the acquisition, construction, and alteration of public buildings. *See, e.g.,* 40 U.S.C. § 3304. Missing from Plaintiff's analysis is an explanation as to why Congress stated this provision does not apply to the Immigration and Nationality Act (or why that matters here), and Plaintiff has provided no case law interpreting this provision in the manner it advocates. And there is certainly no <u>express intent</u> by Congress that local zoning laws will not apply to privately constructed, owned and operated immigration detention centers. Without this, Plaintiff's express preemption argument fails.

None of the U.S. Code provisions cited by GEO (8 U.S.C. §§ 1103, 1231 and 6 U.S.C. §§ 202, 251) in its Complaint or in this Motion are applicable or provide for express preemption of the City's Ordinance. It is true that DHS "shall arrange for appropriate places

---

[20] *Plaintiff's Motion*, at 14:18-21.

DEF'S CROSS-MOT. FOR M.S.J. - 30
3:18-cv-05233-RBL

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

of detention for aliens detained pending removal or a decision on removal," (8 U.S.C. § 1231(g)), but the cases interpreting this provision say nothing about or any limitations on the siting of detention facilities, nor do they give authority to the federal contractors to bypass local zoning regulations. They only stand for the proposition that DHS has the authority to place the detainees at the detention facility location they deem appropriate (subject to judicial review). *See, e.g. Ms. L. v. U.S Immigration & Customs Enf't*, 302 F. Supp. 3d 1149, 1160 (S.D. Cal. 2018). And none of the statutes nor interpretative case law say anything about expansion or enlargement of an existing privately owned and operated detention facility.

In short, there are no statutory provisions which expressly preempt the City's Ordinance. As stated above, preemption is a disfavored remedy, and GEO has not provided this Court with any statutes upon which this Court can find express preemption. Summary judgment should be entered in the City's favor on express preemption.

### b.    Field preemption does not apply

Field preemption is also not applicable here because Congress did not expressly "excuse immigration detention centers from compliance with local zoning regulations."[21].

> The question whether the regulation of an entire field has been reserved by the Federal Government is, essentially, a question of ascertaining the intent underlying the federal scheme. ***Pre-emption should not be inferred, however, simply because the agency's regulations are comprehensive, but rather, courts consider evidence of a desire to occupy a field completely***.

*Washington v. GEO.*, 283 F. Supp. 3d at 977 (emphasis added). In that case, the Court held that "Congress has not chosen to occupy the field of detainee wages." *Id*. Similarly, here, GEO argues that under 8 U.S.C. § 1231, the government has preempted the area of immigration which includes "the detention, release and removal of aliens ordered removed." The City agrees that the federal government is responsible for the "detention, release and removal" of people awaiting immigration proceedings; yet there is nothing contained in the federal statutory scheme evidencing that Congress intended for privately owned and operated detention centers to not be subjected to local zoning laws. Likewise, there is nothing in the

---

[21] *Plaintiff's Motion*, at 15:14-15.

DEF'S CROSS-MOT. FOR M.S.J. - 31
3:18-cv-05233-RBL

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

Ordinance that governs the detention, release, or removal of undocumented people. Preemption is disfavored, and the Court should find no field preemption. *See also, U.S. v Town of Windsor, supra,* 496 F. Supp. at 592 (by choosing to contract with a private operation, private operator must comply with state requirements including zoning laws). Because there is no evidence Congress intended to preempt local zoning laws in the field of immigration, Plaintiff's Motion should be denied, and summary judgment should be entered in the City's favor on field preemption.

### c.   Conflict preemption does not apply

The Ordinance is not preempted under conflict preemption because it does not interfere with the any area that is regulated by the United States in immigration statutes.

> Conflict preemption exists "where it is impossible for a private party to comply with both state and federal requirements," and obstacle preemption exists where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

*Washington v. GEO*, at 977-978. Conflict preemption requires that the state or local action be a material impediment to the federal action or thwart the federal policy in a material way. *See Mt. Olivet Cemetery Ass'n v. Salt Lake City*, 164 F.3d 480, 488-489 (10th Cir.1998). Yet the City of Tacoma does not seek to regulate in any area that is federally regulated. Nothing in the Ordinance even hints at an intent to regulate any area that is federally regulated.

Plaintiff relies on 8 U.S.C. § 1231(g):

> (g) Places of detention
> (1) In general
> The Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal. When United States Government facilities are unavailable or facilities adapted or suitably located for detention are unavailable for rental, the Attorney General may expend from the appropriation "Immigration and Naturalization Service-- Salaries and Expenses", without regard to section 6101 of Title 41, amounts necessary to acquire land and to acquire, build, remodel, repair, and operate facilities (including living quarters for immigration officers if not otherwise available) necessary for detention.
> (2) Detention facilities of the Immigration and Naturalization Service
> Prior to initiating any project for the construction of any new detention facility for the Service, the Commissioner shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use.

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

This provision merely authorizes the federal government to arrange for appropriate places of detention, and then authorizes the necessary money to operate these facilities; the provision is entirely silent as it pertains to limitations on a city's zoning authority, the type of permits required for operation or expansion, or the process for obtaining local land use approvals.

The law is well-settled that "[t]he power of local governments to zone and control land use is undoubtedly broad.... [T]he courts generally have emphasized the breadth of municipal power to control land use..." *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 68 (1981); *see also Izzo v. Borough of River Edge*, 843 F.2d 765, 769 (3d Cir. 1988) ("Land use policy customarily has been considered a feature of local government and an area in which the tenets of federalism are particularly strong."). Keeping in mind this significant discretion afforded local governments in zoning and regulating land use, the statute cited by Plaintiff cannot be construed to authorize immigration detention centers to disregard local zoning laws, regardless of whether they are owned privately or by the government.

This Court should follow the *Washington v. GEO* court, which found that and dismissed GEO's similar preemption claims there.  In that case, the Court ultimately found that "[a]fter peeling back the rhetoric and examining the actual statutes and regulations… the Court cannot find evidence of congressional intent—either express or implied—sufficient to overcome the presumption against preemption." *Washington v. Geo Group*, at 978. Similarly here, when peeling away GEO's rhetoric, there is simply no evidence of Congressional intent in the statutory scheme of the Immigration and Nationality Act—either express or implied—to overcome the presumption against preemption, particularly regarding the inherently local nature of land use zoning and regulation.  Summary judgment should be entered in the City's favor on Plaintiff's conflict preemption claim.

### 3.    Plaintiff has made no showing of entitlement to an injunction or a declaratory judgment, and those requests should be denied

Plaintiff's Motion devotes virtually none of its 18-page Motion to its request for an Injunction and a Declaratory Judgment beyond a cursory reference to that relief.  Dkt. 50, at 7:20-26 and 23:1-6. Plaintiff provides no law, no analysis and no other support for either

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

request. Because no law, argument or analysis is provided for either request, they should be denied. "A plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007). Even in the absence of a heightened pleading standard, claims for relief in motions and pleadings must give fair notice about which claim are alleged and on what grounds. *Swierkiwicz v. Sorema N.A.*, 534 U.S. 506, 514, 122 S. Ct. 992 (2002). Issues raised on summary judgment must be anchored to concrete pleadings or the factual record to warrant injunctive relief. *Nebraska v. Wyoming*, 507 U.S. 584, 602, 113 S. Ct. 1689 (1993). When a party moving for summary judgment fails to provide any law to support a proposition, the argument may be presumed abandoned and meritless. *See Alabama v. North Carolina*, 560 U.S. 330, 342, 130 S. Ct. 2295 (2010).

Plaintiff has provided no explanation, argument, or analysis for its injunction and declaratory judgment claims beyond a mere conclusory request for such relief—failing to even state the elements of the causes of action. Summary judgment should be entered in the City's favor on these claims.

### 4.   Plaintiff's request for attorneys' fees under 42 U.S.C. § 1988 is unsupported by law and should be denied

Plaintiff requests attorneys' fees under 42 U.S.C. §1988 based on its belief it is entitled to an Injunction or a Declaratory Judgment. Even if it obtained injunctive relief or a declaratory judgment, Plaintiff cannot not recover attorneys' fees here. A violation of the Supremacy Clause claim does not support a claim for relief under § 1983 and, therefore, Plaintiff lacks a substantive basis to support a claim for § 1988 attorney's fees. *White Mountain Apache Tribe v. Williams*, 810 F.2d 844, 852 (9th Cir.1985).

42 U.S.C. § 1988 governs the process and scope of relief in actions involving certain Title 42 provisions. 42 U.S.C. § 1988 (2018) (allowing the court discretion to award attorney's fees "to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92-318, the Religious Freedom Restoration Act of 1993,

KEATING, BUCKLIN & MCCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

the Religious Land Use and Institutionalized Persons Act of 2000, title VI of the Civil Rights Act of 1964, or section 12361 of Title 34"). If a plaintiff successfully obtains injunctive or declaratory relief under one of the <u>named provisions</u> in Section 1988(b), the judgment will usually render the plaintiff the prevailing party. *See, Lefemine v. Wideman*, 568 U.S. 1, 133 S. Ct. 9 (2013).  However, "[t]he Supremacy Clause, of its own force, does not create rights enforceable under § 1983." *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 107, 110 S. Ct. 444, 449 (1989). And without establishing an independent, valid claim for relief under one of the Title 42 provisions, such as § 1983, Plaintiffs have no substantive right to recover Section 1988 attorneys' fees. *Richardson v. Cont'l Grain Co.,* 336 F.3d 1103, 1106 (9th Cir. 2003); *Pierre v. Jordan*, 333 F.2d 951, 958 (9th Cir.1964); *See also, White Mountain Apache Tribe v. Williams*, 810 F.2d at 849–50 ("…preemption of state law under the Supremacy Clause—at least if based on federal occupation of the field or conflict with federal goals—will not support an action under § 1983, and will not, therefore, support a claim of attorney's fees under § 1988.").

Furthermore, and like in *Williams*, Plaintiff has provided no explanation or substantive argument to support its claim to attorney's fees in its motion for summary judgment. Beyond a mere throw-away statement claiming a right to attorney's fees and costs—failing to even state the elements of the cause of action—Plaintiff failed to identify the grounds for its claim to § 1988 relief or provide any case law to support its position. Accordingly, Plaintiff's unsubstantiated claim to fees must fail. Summary judgment should be entered in the City's favor dismissing Plaintiff's claims for § 1988 fees.

## V.   <u>CONCLUSION</u>

Defendant City of Tacoma respectfully requests this Court dismiss Plaintiff's lawsuit *in toto* on the ripeness/standing grounds discussed above. Alternatively, if the Court determines some part of this lawsuit is justiciable, the Court should deny Plaintiff's Motion for Partial Summary Judgment and enter judgment in favor of the City on plaintiff's claims

**KEATING, BUCKLIN & MCCORMACK, INC., P.S.**
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

regarding (1) federal pre-emption, (2) Supremacy Clause/intergovernmental immunity, (3) declaratory/injunctive relief, and (4) attorney's fees under § 1988.

DATED:  August 16, 2019

KEATING, BUCKLIN & McCORMACK, INC., P.S.


By:  */s/ Michael C. Walter*
Michael C. Walter, WSBA #15044
Brian C. Augenthaler, WSBA #44022
Attorney for Defendant City of Tacoma

801 Second Avenue, Suite 1210
Seattle, WA  98104
Phone: (206) 623-8861
Fax:     (206) 223-9423
Email: mwalter@kbmlawyers.com

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

1

## CERTIFICATE OF SERVICE

2          I hereby certify that on August 16, 2019, I electronically filed the foregoing with the

3  Clerk of the Court using the CM/ECF system which will send notification of such filing to

4  the following:

5  **Attorneys for Attorney for Plaintiff**          **Attorneys for Attorney for Plaintiff**
   **The GEO Group Inc.**                            **The GEO Group Inc.**
6

7  Clayton P. Graham                                 Joan K Mell
   Joseph P. Hoag                                    III BRANCHES LAW PLLC
8  DAVIS WRIGHT TREMAINE LLP                         1019 REGENTS BLVD STE 204
   920 Fifth Ave., Suite 3300                        FIRCREST, WA 98466
9  Seattle, WA  98104-1610                           Phone:  253-566-2510
   Phone:  206-757-8052                              Email:  joan@3brancheslaw.com
10 Phone:  (206) 757-8299
   Email:  claytongraham@dwt.com
11 Email:  JosephHoag@dwt.com

12
   **Attorneys for Defendant**
13 **City of Tacoma**

14
   Steve Victor
15 CITY OF TACOMA
   747 MARKET ST
16 STE 1120
   TACOMA, WA 98402
17 Phone:  253-591-5638
   Email:  svictor@ci.tacoma.wa.us
18

19

20 DATED:  August 16, 2019

21

22                                                   */s/ Michael C. Walter*
                                                     Michael C. Walter, WSBA #15044
23                                                   Attorney for Defendant City of Tacoma
                                                     801 Second Avenue, Suite 1210
24                                                   Seattle, WA  98104
                                                     Phone: (206) 623-8861
25                                                   Fax:    (206) 223-9423
                                                     Email: mwalter@kbmlawyers.com
26

27

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423