1

HONORABLE RONALD B. LEIGHTON

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

7

8

THE GEO GROUP, INC.,

CASE NO. 3:18-cv-05233-RBL

9

Plaintiff,

ORDER ON CROSS MOTIONS FOR
SUMMARY JUDGMENT

10

v.

11

CITY OF TACOMA, a Washington
municipal corporation,

DKT. ## 50 & 63

12

Defendant.

13

14

**INTRODUCTION**

15

THIS MATTER is before the Court on Plaintiff The GEO Group, Inc., and Defendant

16

City of Tacoma's Cross Motions for Summary Judgment. Dkt. ## 50 & 63. GEO is a private

17

company that owns and operates the Northwest Detention Center (NWDC), an immigration

18

detention facility in Tacoma's industrial tide flats district. GEO operates NWDC pursuant to a

19

contract with Immigration and Customs Enforcement. On March 7, 2018, the City passed

20

Amended Ordinance No. 28491, which restricts the ability of correctional and detention facilities

21

to expand or modify their existing facilities in certain urban zones, including the zone where

22

NWDC is located. This prompted GEO to sue the City to invalidate the Amended Ordinance as

23

unconstitutional.

24

1    The Court previously dismissed GEO's § 1983 damages claim. *See* Dkt. # 48. Now, GEO

2    moves for summary judgment on its claims under the Supremacy Clause seeking declaratory and

3    injunctive relief. Dkt. # 50. According to GEO, the City's Amended Ordinance is

4    unconstitutional because it directly regulates and discriminates against the Federal Government

5    and is preempted by federal immigration law. The City has filed its own Cross Motion for

6    Summary Judgment arguing that it is entitled to judgment on GEO's Supremacy Clause claims

7    and that all of GEO's claims are not justiciable. Dkt. # 63.

8    For the following reasons, the Court GRANTS the City's Motion in part and DENIES

9    GEO's Motion.

10   **BACKGROUND**

11   GEO is a private company specializing in corrections, detention, and mental health

12   treatment. For several years, GEO has operated NWDC as an immigration detention facility

13   pursuant to a contract with ICE. Under its contract, GEO must "furnish the facility and services

14   inclusive of a trained and qualified management staff, supervision, manpower, relief officer(s),

15   uniforms, equipment, vehicles, and supplies." 2015 ICE Contract, Dkt. # 51-1, at 43. The

16   contract further provides that GEO must supply "a safe and secure environment for staff and

17   detainees" and a facility that "shall accommodate 1,575 adult detainees." *Id*. at 45. GEO's

18   relationship with ICE is described as a "partnership" that is "open, collaborative, customer-

19   oriented, and professional." *Id*. at 43. The contract states that only ICE detainees may be kept at

20   NWDC and GEO cannot use the facility to house detainees from other agencies without ICE's

21   approval. *Id*. at 51-1. The contract has apparently been amended ten times, but none of the

22   amendments make fundamental changes to GEO's relationship with ICE. *See* ICE Contract

23   Amendments, Dkt. # 51-2.

24

1       On March 7, 2017, the City passed Interim Emergency Ordinance No. 28417, which

2  "identif[ied] private correctional facilities as an unpermitted use in all zoning districts."

3  Dkt. # 52, Ex. C, at 3-4. Ordinance 28417 specifically singled out NWDC as the only private

4  facility that could be affected by this prohibition. *Id*. at 2. On April 24, the Acting Director of

5  ICE sent a letter to the mayor of Tacoma expressing his concern about Ordinance No. 28417

6  singling out NWDC, a facility used by the Federal Government. Homan Letter, Dkt. # 52, Ex. D.

7  Several weeks later, the City passed Modified Interim Emergency Ordinance No. 28429, which

8  removed the blanket prohibition on private facilities. Dkt. # 51, Ex. E.

9       On February 6, 2018, the City solidified the goals from its interim ordinances by passing

10 Amended Ordinance No. 28491. The Amended Ordinance prohibits correctional and detention

11 facilities in all zoning districts other than Light Industrial (M-1). Dkt. # 52-1, Ex. F, at 2-3. It

12 also "require[s] a Conditional Use Permit [CUP] for new correctional and detention facilities (in

13 zones where they are allowed) or significant modifications to existing ones" and "limit[s] the

14 availability of expansion for correctional and detention facilities by conditional use in the M-1

15 zone, to M-1 zones that were in place as of January 1, 2018." *Id*. at 3. The accompanying

16 revisions to the City's Municipal Code provide that detention and correctional facilities are

17 permitted only in the M-1 zone with a CUP. Dkt. # 70-2, Ex. M, at 159-60. The Code further

18 states that a CUP is "only available in the M-1 zones in place as of January 1, 2018." *Id*. Initially,

19 this limitation was only imposed on detention facilities (i.e., NWDC), *see id.*, but it now applies

20 to both detention and correctional facilities, *see* TACOMA, WASH., MUNICIPAL CODE,

21 § 13.06.400, https://cms.cityoftacoma.org/cityclerk/Files/MunicipalCode/Title13-LandUse

22 RegulatoryCode.PDF (last visited Nov. 4, 2019).

23

24

1    When the Amended Ordinance was passed, NWDC was located in the Port Maritime &

2    Industrial (PMI) zone, rather than an M-1 zone, and therefore became a nonconforming use.

3    Shakir Decl., Dkt. # 53, at 2; Findings of Fact and Recommendations Report, Dkt. # 70-2, Ex. I,

4    at 3. The City's two public correctional facilities, the Pierce County Jail and the Remann Hall

5    juvenile detention facility, were already nonconforming uses prior to the Amended Ordinance

6    and were "not significantly impacted" by its passage. *Id*. at 3-4.

7    The Amended Ordinance explains several of the City's considerations in passing the new

8    zoning rules. They include "quality of life, health, safety, environmental, equity, and liability

9    concerns of people living in areas not appropriate for human living," such as the "Tideflats

10   industrial area." Amended Ordinance, Dkt. # 52-1, Ex. F, at 1-2. In public hearings and through

11   other writings, however, several Tacoma City Councilmembers have expressed disapproval of

12   private prisons, GEO specifically, and President Trump's immigration agenda. Graham Decl.,

13   Dkt. # 70, Exs. C, E, F, & G.

14                                    **DISCUSSION**

15   **1.    Standing and Ripeness**

16   The City argues that GEO's claims are not justiciable because they lack standing and

17   their dispute is not ripe. To be justiciable under Article III of the U.S. Constitution, a claim must

18   present a concrete "case or controversy" to invoke the court's jurisdiction. *Thomas v. Anchorage*

19   *Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000). On summary judgment, a plaintiff

20   may not merely rely on allegations in their complaint but must "set forth by affidavit or other

21   evidence specific facts" showing that they have standing and their dispute is ripe. *Lujan v. Defs.*

22   *of Wildlife*, 504 U.S. 555, 112 S. Ct. 2130, 2134 (1992).

23

24

The ripeness inquiry is "designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000). Ripeness involves both constitutional and prudential components. *Id*. The constitutional component largely overlaps with standing and asks whether the plaintiff faces a "realistic danger of sustaining a direct injury" or "whether the alleged injury is too 'imaginary' or 'speculative' to support jurisdiction." *Id*. at 1139 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). The prudential component is distinct from standing and turns on "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126 (9th Cir. 2009) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).

Courts addressing challenges under the Supremacy Clause have analyzed whether the relevant law poses a concrete threat to the plaintiff. In *United States Postal Service v. City of Berkeley*, a case similar to this one, the court determined that the dispute was ripe because Berkeley's ordinance was an "active and ongoing" obstruction to USPS's ability to sell its property. 228 F. Supp. 3d 963, 967 (N.D. Cal. 2017). The court observed that USPS had been trying to sell for years; in fact, Berkeley's ordinance was passed as a last-ditch effort to thwart a particular sale. *Id*. at 965-66. In *United States v. Supreme Court of New Mexico*, where the plaintiffs challenged a rule that would place restrictions on federal prosecutors' ability to issue subpoenas, the court held that standing was satisfied because there was evidence of prosecutors declining to issue subpoenas to avoid discipline under the rule. 839 F.3d 888, 899-901 (10th Cir. 2016).

1    In the current set of briefs, GEO provides no evidence of actions that would bring it into

2    contact with the Amended Ordinance. *See* GEO Opposition, Dkt. # 69, at 8. However, in

3    response to the City's previous Motion for Summary Judgment, GEO produced a declaration

4    stating that the company "continues to work with its consultants at Lydig Construction and

5    Integrus Architecture to plan for expansions" to NWDC. Shakir Decl., Dkt. # 42, at 1. GEO

6    apparently wishes to modify NWDC to accommodate "new programs, training, administrative

7    offices, and multipurpose spaces," as well as "new structured and surface parking areas." *Id*.  To

8    substantiate these attestations, GEO produced a letter from Integrus Architecture explaining the

9    "disciplines and tasks necessary" to apply for a CUP and an invoice showing that GEO has been

10   billed $4,133.00 for a pre-construction "feasibility study." Dkt. # 41, Ex. A; Dkt. # 42, Ex. B.

11   This evidence is sufficient to establish standing and ripeness. Although the pre-

12   construction work GEO commissioned may be unrelated to the Amended Ordinance's CUP

13   requirements, it nonetheless evidences that GEO has expended time and money on a future

14   project at NWDC. It is possible that this project may be abandoned or even that it is nothing

15   more than a litigation strategy. However, GEO's evidence is still enough to show that it faces a

16   more-than-speculative likelihood of being injured by the City's Ordinance. The prudential

17   component of ripeness is also satisfied—GEO need not have actually applied for a permit for the

18   Court to adjudicate its claims and withholding judgment could force GEO to expend more

19   resources on a CUP requirement that may not be constitutionally tenable. GEO's claims are

20   therefore justiciable.

21   The City argues strenuously that GEO's claims are not ripe because it has not applied for

22   a CUP to expand NWDC. The City is correct that the Ninth Circuit typically imposes stricter

23   ripeness requirements for "constitutional challenge[s] to land use regulations." *See Kawaoka v.*

24

1   *City of Arroyo Grande*, 17 F.3d 1227, 1232 (9th Cir. 1994). In such cases, a plaintiff must obtain

2   a "final and authoritative determination" regarding development of their property before the

3   dispute becomes ripe. *Kinzli v. City of Santa Cruz*, 818 F.2d 1449, 1453 (9th Cir. 1987) (quoting

4   *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 348 (1986)). This means that the

5   plaintiff must have "submitted a development plan which was rejected, [and sought] variances

6   which would permit uses not allowed under the regulations." *Id*. at 1454 (citing *Williamson*

7   *County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 187 (1985)). Although

8   there is a "futility exception," even this "does not alter a party's obligation to file at least one

9   meaningful development proposal." *Kawaoka*, 17 F.3d at 1232 (citing *Herrington v. County of*

10  *Sonoma*, 857 F.2d 567, 569 (9th Cir.1988)).

11      However, these "[r]ipeness requirements are relevant only to as applied challenges, and

12  not to facial challenges." *Id*. (internal quotation omitted) (citing *S. Pac. Transp. Co. v. Los*

13  *Angeles*, 922 F.2d 498, 507 (9th Cir.1990)). In land use cases, a facial challenge is "a claim that

14  the mere adoption of the ordinances constitutes" a constitutional deprivation. *Southern Pacific*,

15  922 F.2d at 505. Where a claim has "characteristics of both" a facial and as applied challenge,

16  the Supreme Court has held that a facial standard applies if the requested relief would "reach

17  beyond the particular circumstances of the plaintiffs" to restrict enforcement of the law more

18  broadly. *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010). This applies equally to narrowly-

19  worded injunctions that would nonetheless have the practical effect of limiting the law's

20  enforcement. *See Ctr. for Competitive Politics v. Harris*, 784 F.3d 1307, 1314 (9th Cir. 2015)

21  (following *Reed*).

22      GEO's challenge is essentially facial. GEO's claims under the Supremacy Clause boil

23  down to an argument that the Amended Ordinance itself unconstitutionally regulates the Federal

24

1    Government by prohibiting expansion of detention facilities or conditioning expansion on a

2    CUP. Furthermore, GEO's requested relief would reach beyond its own circumstances because a

3    determination that the Amended Ordinance is unconstitutional with respect to NWDC would

4    compel the same conclusion for other facilities with ties to the Federal Government, even if none

5    currently exist. Although the City argues that GEO's claims are not a facial challenge because

6    GEO focuses only on how the Amended Ordinance affects NWDC, a facial challenge need not

7    be completely divorced from the real-world context in which a law is enacted. *See, e.g.,*

8    *Kawaoka*, 17 F.3d at 1234-38 (analyzing a facial due process challenge by considering the

9    properties that the ordinance applied to, including the plaintiffs'). Because GEO's claims amount

10   to a facial challenge, the "final determination" requirement for ripeness does not apply.

11   **2.      Facial Supremacy Clause Challenge**

12          On the merits, the parties' Motions focus only on GEO's Supremacy Clause challenge to

13   the Amended Ordinance. As the Court has explained and GEO has insisted, GEO's challenge is

14   facial because it addresses the Amended Ordinance itself and its requirements for expanding

15   detention facilities, rather than the manner of a specific application. Plaintiffs must clear a "high

16   bar" to succeed in a facial challenge. *Puente Arizona v. Arpaio*, 821 F.3d 1098, 1104 (9th Cir.

17   2016). A law is only facially unconstitutional if "no set of circumstances exists under which the

18   Act would be valid. The fact that [the Amended Ordinance] might operate unconstitutionally

19   under some conceivable set of circumstances is insufficient to render it wholly invalid." *S.D.*

20   *Myers, Inc. v. City & Cty. of San Francisco*, 253 F.3d 461, 467 (9th Cir. 2001) (quoting *United*

21   *States v. Salerno*, 481 U.S. 739, 746 (1987)); *see also Puente Arizona*, 821 F.3d at 1104 (holding

22   that the strict facial challenge standard from *Salerno* applies to challenges under the Supremacy

23   Clause).

24

1    The Supremacy Clause establishes that the laws of the United States "shall be the

2    supreme Law of the Land[,] . . . anything in the Constitution or Laws of any State to the Contrary

3    notwithstanding." U.S. Const. art. VI, cl. 2. GEO asserts two broad arguments under the

4    Supremacy Clause. First, GEO argues that the Amended Ordinance is invalid under the

5    intergovernmental immunity doctrine, which prohibits state or local laws that directly regulate or

6    discriminate against the Federal Government. Second, GEO contends that the Amended

7    Ordinance is preempted by acts of congress. More specifically, GEO asserts that the Amended

8    Ordinance is expressly preempted by a web of statutes related to public buildings and immigrant

9    detention, *see* 40 U.S.C. §§ 3312(c), 3301(b); 8 U.S.C. § 1231(g), and implicitly preempted

10   because it conflicts with other federal statutes and because congress has occupied the field of

11   immigration law.

12   *a.      Intergovernmental Immunity*

13   The so-called "intergovernmental immunity doctrine" derives from the Supreme Court's

14   decision in *McCulloch v. Maryland*, which held that "the states have no power, by taxation or

15   otherwise, to retard, impede, burden, or in any manner control, the operations of the

16   constitutional laws enacted by congress to carry into execution the powers vested in the general

17   government." *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010) (quoting

18   *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819)). State or local governments therefore

19   may not "regulate[] the United States directly or discriminate[] against the Federal Government

20   or those with whom it deals." *Id.* (quoting *North Dakota v. United States*, 495 U.S. 423, 435

21   (1990)).

22   Under the "direct regulation" branch of the intergovernmental immunity doctrine, "states

23   [and local governments] may not directly regulate the Federal Government's operations or

24

property." *Blackburn v. United States*, 100 F.3d 1426, 1435 (9th Cir. 1996). For example, *Boeing Co. v. Movassaghi* held that California could not impose uniquely stringent requirements on the activities of Boeing, a federal contractor, at a federal cleanup site. 768 F.3d 832, 839 (9th Cir. 2014); *see also Blackburn*, 100 F.3d at 1426 (California law requiring safety signs and ropes at parks was invalid as applied to Yosemite National Park).

A law may also violate the intergovernmental immunity doctrine by discriminating against the Federal Government. "A state or local law discriminates against the Federal Government if it treats someone else better than it treats the government." *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010). In other words, the law must be "imposed on some basis unrelated to the object's status as a Government contractor or supplier" and be "imposed equally on other similarly situated constituents of the State." *North Dakota v. United States*, 495 U.S. 423, 438 (1990). Analysis of an allegedly discriminatory ordinance "must proceed from the text of the ordinance, not the alleged motives behind it." *United States Postal Service v. City of Berkeley*, 228 F. Supp. 3d at 969 (quoting *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1146 n.7 (9th Cir. 2004)). However, "the inevitable effect of a statute on its face may render it unconstitutional." *Id.* (quoting *United States v. O'Brien*, 391 U.S. 367, 384-85 (1968)).

The intergovernmental immunity doctrine, and the Supremacy Clause generally, apply to federal contractors insofar as the challenged law "regulate[s] what the federal contractors [have] to do or how they [do] it pursuant to their contracts." *Boeing Co.*, 768 F.3d at 839. Thus "a federally owned facility performing a federal function is shielded from direct state regulation, even though the federal function is carried out by a private contractor, unless Congress clearly authorizes such regulation." *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 181 (1988). Likewise, private entities may not be subjected to discriminatory treatment "on account of their

1    dealings with" the Federal Government. *Boeing*, 768 F.3d at 842 (quoting *North Dakota v.*

2    *United States*, 495 U.S. 423, 435 (1990)). Increased economic burden on federal contractors,

3    however, is not enough to violate the Supremacy Clause. *Id.* at 839.

4         Here, GEO has not shown that the Amended Ordinance directly regulates the Federal

5    Government. GEO seems to believe that its relationship with ICE provides a complete shield

6    against any regulation, but that is incorrect. A federal contractor's immunity is limited by the

7    scope of its obligations to the U.S. government. *See Boeing Co.*, 768 F.3d at 839. In this case, the

8    Amended Ordinance's restrictions on expansion do not necessarily interfere with how GEO

9    carries out its contractual duties. It is perfectly conceivable that GEO could want to expand its

10   own private facility for its own private reasons. Indeed, there is no evidence that the Federal

11   Government has anything to do with GEO's vague plans to expand NWDC or that all

12   conceivable expansions are integral to processing immigrants. GEO's planned expansion could

13   be for something as superfluous as a management lounge or as anticipatory as a new wing to

14   accommodate a contract with a different agency. *See* 2015 ICE Contract, Dkt. # 51-1, at 53. In

15   short, the Supremacy Clause does not automatically bar local regulation of a contractor's

16   property that does not necessarily impede the federal operations going on there.

17        GEO insists that intergovernmental immunity bars any building codes from applying to

18   federal contractors and relies on several out-of-circuit decisions to support this proposition. The

19   Court is not bound by these decisions, but the current case is distinguishable at any rate. In *U.S.*

20   *Postal Service v. City of Hollywood, Fla.*, the court held that a city could not mandate its own

21   permitting requirements on a USPS project to build a new post office on land leased from a

22   private party. 974 F. Supp. 1459, 1461, 1462-63 (S.D. Fla. 1997); *see also U.S. Postal Serv. v.*

23   *Town of Greenwich, Conn.*, 901 F. Supp. 500, 506 (D. Conn. 1995) (finding intergovernmental

24

1    immunity where USPS "contracted with private companies to lease the site and to construct a

2    building instead of purchasing land and constructing the building itself."). But there is no direct

3    government involvement here—there is no evidence of ICE taking steps to expand NWDC. Even

4    if such a situation is conceivable, GEO's facial challenge can only succeed if "no set of

5    circumstances exists" under which the Amended Ordinance could be constitutional. *Salerno*, 481

6    U.S. at 746. GEO cannot meet this standard.[1]

7        The Amended Ordinance is also non-discriminatory. GEO contends that the Amended

8    Ordinance is discriminatory because it limits expansion to M-1 zones in place as of January 1,

9    2018, for detention facilities (i.e. NWDC) but contains no such limitation for correctional

10   facilities (i.e. the Pierce County Jail and Remann Hall). GEO is correct that the City's Municipal

11   Code initially contained this imbalance after the Amended Ordinance was passed (as explained

12   in footnote 1, it is unclear whether this language actually prohibits expansion). *See* Graham

13   Decl., Dkt. # 70-2, Ex. M, at 159-60. However, the City states that this was a scrivener's error

14   that has been corrected. *See* Victor Decl., Dkt. # 66. Indeed, the City's Code now imposes the

15   same requirements on detention and correctional facilities, and the Amended Ordinance itself

16   contains no unequal language. *See* Tacoma, Wash., Municipal Code, § 13.06.400, https://cms.

17   cityoftacoma.org/cityclerk/Files/MunicipalCode/Title13-LandUseRegulatoryCode.PDF (last

18   visited Nov. 4, 2019); Dkt. # 52, Ex. F, at 3. Any prior discrimination has therefore ceased.

19

20  

---

[1] The parties also argue over whether the Amended Ordinance creates a full moratorium on expanding NWDC or

21   simply requires a CUP for expansion. While the revisions to the City's Municipal Code suggest that expansion is prohibited outside the M-1 zone, *see* Dkt. # 70-2, Ex. M, at 160, the Amended Ordinance itself states that "a

22   Conditional Use Permit [is required for] . . . significant modifications to existing" facilities, Dkt. # 52-1, Ex. F, at 3, and the Code explains that a CUP may be acquired for expansions to non-conforming uses, *see* Tacoma, Wash.,

23   Municipal Code, § 13.06.630, https://cms.cityoftacoma.org/cityclerk/Files/MunicipalCode/Title13-LandUse RegulatoryCode.PDF (last visited Nov. 4, 2019). The Court need not resolve this dispute because, even if the Amended Ordinance prohibits expansion of NWDC, it still does not necessarily interfere with GEO's obligations to

24   the Federal Government.

1       GEO also argues that the Amended Ordinance is discriminatory because it only imposes

2 new restrictions on NWDC. But this is because Tacoma's two public correctional facilities were

3 "already nonconforming use[s]" before the Amended Ordinance was passed. *See* Findings of

4 Fact and Recommendations Report, Dkt. # 70-2, Ex. I, at 3-4. In other words, rather than

5 "treat[ing] someone else better than . . . the [federal] government," *Arcata*, 629 F.3d at 991, the

6 Amended Ordinance merely imposes the same restrictions on NWDC that already applied to

7 state facilities. This type of equal treatment is the opposite of discrimination.[2]

8 ***b.     Preemption***

9       In addition to its intergovernmental immunity argument, GEO contends that the

10 Amended Ordinance is preempted by federal law. There are three types of federal preemption:

11 express, field, and conflict. *Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 724

12 (9th Cir. 2016). Express preemption only occurs if a statute explicitly "withdraw[s] specified

13 powers from the States." *Arizona v. United States*, 567 U.S. 387, 399 (2012). Courts should "use

14 the text of the provision, the surrounding statutory framework, and Congress's stated purposes in

15 enacting the statute to determine the proper scope of an express preemption provision." *Chae v.*

16 *SLM Corp.*, 593 F.3d 936, 942 (9th Cir. 2010). If the text of a law is susceptible to multiple

17 readings, "courts ordinarily accept the reading that disfavors pre-emption." *McClellan v. I-Flow*

18 *Corp.*, 776 F.3d 1035, 1039 (9th Cir. 2015) (internal quotation omitted).

19       Field preemption prohibits states from "regulating conduct in a field that Congress, acting

20 within its proper authority, has determined must be regulated by its exclusive governance."

21

22 [2] GEO also relies on statements by some Tacoma City Councilmembers in arguing that the Amended Ordinance was
passed with discriminatory intent. However, the intergovernmental immunity analysis is not concerned with the
23 potential "nefarious motive" behind the challenged law. *City of Berkeley*, 228 F. Supp. 3d at 969 (quoting *RUI One*
*Corp. v. City of Berkeley*, 371 F.3d 1137, 1146 n.7 (9th Cir. 2004)). This makes any politically-motivated statements
24 by City Councilmembers irrelevant.

1   *Arizona*, 567 U.S. at 399. This intent can only be "inferred from a framework of regulation 'so

2   pervasive . . . that Congress left no room for the States to supplement it' or where there is a

3   'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement

4   of state laws on the same subject.'" *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218,

5   230 (1947)).

6         Finally, conflict preemption is exactly what it sounds like—a rule preempting state and

7   local laws that conflict with federal law. *McClellan*, 776 F.3d at 1039. A conflict may occur

8   when "compliance with both federal and state regulations is a physical impossibility" or when

9   the state law "stands as an obstacle to the accomplishment and execution of the full purposes and

10  objectives of Congress." *Id.* (quoting *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S.

11  132, 142–143 (1963) and *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

12        When conducting preemption analysis, courts should be "mindful of the adage that

13  Congress does not cavalierly preempt" state and local laws. *Nat'l Fed'n of the Blind*, 813 F.3d at

14  724 (quoting *Montalvo v. Spirit Airlines*, 508 F.3d 464, 471 (9th Cir.2007)). Laws enacted

15  pursuant to a state or local government's historic police powers should be presumed valid

16  "unless [preemption] was the clear and manifest purpose of Congress." *Arizona*, 567 U.S. at 400.

17        Here, none of GEO's preemption arguments hold water. GEO's claim of express

18  preemption turns on a convoluted interpretation of several congressional statutes governing

19  public buildings and immigrant detention. Basically, GEO argues that the Federal Government

20  need only "consider" (rather than adhere to) local zoning laws when constructing federal

21  buildings, *see* 40 U.S.C. § 3312(c), and need not even do that in the case of federal immigration

22  detention facilities, *see* 40 U.S.C. § 3301(b); 8 U.S.C. § 1231(g).

23

24

1    Fortunately, the Court need not delve too far into the tortured logic supporting these

2    conclusions because GEO's arguments fail for a more obvious reason: these statutes apply to

3    *federal* projects. 40 U.S.C. § 3312(c) provides that "each building constructed or altered *by the*

4    *administration or any other federal agency* shall be constructed or altered only after

5    consideration of all . . . zoning laws." (emphasis added). Even if the word "consider" bears the

6    loose meaning that GEO proposes, it is irrelevant here because NWDC is a private facility that

7    can be expanded by its private owner. There is no reason to believe that changes to NWDC

8    would necessarily be ordered by the Federal Government. Similarly, 8 U.S.C. § 1231(g) states

9    that the "*Attorney General* shall arrange for appropriate places of detention for aliens detained

10   pending removal." (emphasis added). It says nothing about a federal contractor's decision to

11   modify its own facility or the applicability of local zoning laws. This is a far from a "clear and

12   manifest statement" by congress preempting local law. *See Arizona*, 567 U.S. at 400.

13   There is also no field preemption. GEO relies on the Immigration and Nationality Act,

14   which constitutes "a comprehensive and complete code covering all aspects of admission of

15   aliens to this country," *Toll v. Moreno*, 458 U.S. 1, 13 (1982), including "the detention, release,

16   and removal of aliens" and "places of detention," 8 U.S.C. § 1231(g). But as the Court has

17   already explained, the Amended Ordinance does not impact the Attorney General's ability to rent

18   "facilities adapted or suitably located for detention," § 1231(g), nor does it regulate any aspect of

19   how immigrants are processed at NWDC.  This is simply not a law "on the same subject" as the

20   Immigration and Nationality Act. *See Arizona*, 567 U.S. at 399.

21   Finally, the Amended Ordinance also does not conflict with federal law for similar

22   reasons. Although the Federal Government has "discretion to select the detention facilities where

23   aliens are to be detained," *Comm. of Cent. Am. Refugees v. I.N.S.*, 795 F.2d 1434, 1438 (9th

24

Cir.), the Amended Ordinance does not obstruct that discretion. The Amended Ordinance's requirements for theoretical expansions to NWDC do not interfere with the government's decision to contract with GEO and detain immigrants at NWDC. There is thus no conflict preemption or other preemption of any kind. The Amended Ordinance survives GEO's facial Supremacy Clause challenge.

## CONCLUSION

For the above reasons, GEO's Motion for Partial Summary Judgment is DENIED and the City's Motion is GRANTED in part. GEO's claims under the Supremacy Clause are dismissed.

IT IS SO ORDERED.

Dated this 13th day of November, 2019.

Ronald B. Leighton
United States District Judge